NO. 91-212

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

FILED

MAR 0 0 1992

CL___ OF SUPREME COURT
STATE OF MONTANA

IN THE MATTER OF W.M., Respondent and Appellant.

APPEAL FROM: District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Dorothy McCarter, Judge presiding?

COUNSEL OF RECORD:

_ED

MAR 1 0 1992

Smith
SUPREME COURT
MONTANA

For Appellant:

Andree Larose, Attorney at Law, Helena, Montana.

For Respondent:

Hon. Marc Racicot, Attorney General, Helena,
Montana: Kathy Seeley, Assistant Attorney General,
Helena, Montana; Mike McGrath, County Attorney,
Helena, Montana; K. Paul Stahl, Deputy County
Attorney, Helena, Montana.

Submitted on Briefs: February 6, 1992

Decided: March 10, 1992

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

W.M. appeals the order of the District Court of the First Judicial District, Lewis and Clark County, which involuntarily committed him to the Montana Developmental Center. We affirm.

The issue is whether the District Court erred in finding that W.M. was seriously developmentally disabled and in ordering him committed to the Montana Developmental Center for one year.

W.M. was adopted as an infant and lived with his adoptive family until he was sixteen years old, when he moved to a foster home. After he ran away from the foster home repeatedly, he returned to live at his adoptive home for a short time and then was briefly and unsuccessfully placed in several group homes for developmentally disabled adults. He was first admitted to Montana's state institution for the developmentally disabled, the Montana Developmental Center (MDC), in 1983, when he was nineteen years old. At the time of these proceedings, W.M. was an athletic twenty-six-year-old man diagnosed as functioning in the severe range of mental retardation.

On May 29, 1990, W.M. moved from MDC into the Jerome House group home for developmentally disabled adults, located in Helena, Montana, and operated by West Mont. That evening at about 10:00 p.m., W.M. ran away from the group home wearing only his night clothes. Although the staff immediately implemented their in-house missing persons policy, they were unable to locate W.M. About an

2

hour later, neighbors from approximately six blocks away returned W.M. to the group home. They said that he had knocked on their door and asked for help.

On June 21, 1990, after emptying the garbage outside at 9:45 p.m., W.M. again ran away from the group home. The staff called city police to help locate him. According to police reports, he was seen lying on a highway at about 1:00 a.m. He was apprehended by the police two hours later, miles from the group home, while trying to enter a woman's mobile home.

On the afternoon of July 29, 1990, residents of Jerome House, including W.M., went to the Last Chance Stampede Fair and Carnival. As they were leaving the fairground at about 4:30 p.m., W.M. ran away from the group. A staff member was able to follow, but not to stop him during the next hour and a half. During his flight, W.M. ran through an empty field and then into a housing subdivision. He trampled through people's gardens and threw rocks at the staff person who was following him, some of which missed their target and hit homes and other property. He took a bicycle from a garage and rode it (at which point neighbors joined in the chase) and punched the Jerome House staff person when the staff person caught up with him. W.M. entered a vehicle which he found running in a driveway, put it into reverse gear, and ran into the owner's fifth-wheel trailer. When the vehicle stalled, he resumed running on foot

until he was apprehended and physically subdued by police officers about a quarter mile from the accident.

W.M.'s July 29, 1990 run resulted in approximately $5,000 worth of damages, two misdemeanor and two felony charges against him, and a petition by a deputy county attorney that he be detained and treated at MDC. At the hearing held before W.M. was committed to MDC, the District Court heard the following evidence:

Glen Cuchine, an MDC employee who qualified as a "professional person" under § 53-20-102(7), MCA (1989), testified that he had evaluated W.M. pursuant to the District Court's order. He filed with the court his written conclusion that W.M. was seriously developmentally disabled and that the most appropriate placement for him was MDC. Cuchine testified that W.M.'s running behavior was of longstanding duration and had occurred both in group homes and at MDC. He testified that he was not aware of a group home in the state that had enough space or staff to handle W.M.'s running behavior, but that MDC had the resources to handle the behavior.

Daphne Crosbie, an employee of the Montana Department of Social and Rehabilitation Services who handled placement of developmentally disabled persons throughout the state, testified that in her opinion there was no group home in the state where a placement was available and appropriate for W.M. She testified that, at Jerome House, "I don't think they have the staffing

**4**

capability given what he needs when an incident occurs, a running incident."

The habilitation coordinator for West Mont, Jan Paulsen, testified that when W.M. left on his May 29 run there was only one staff person on duty. When he went on his second run, his leaving caused another resident of the group home to become "very upset" and "highly aggressive," which occupied the attention of the staff and led them to call the police to locate W.M. She testified that the staff at West Mont felt that the only way they could success-fully serve W.M. would be if they had the ability to lock him in the house, and that this would pose a risk to other persons in the group home. She testified that they would also need a registered nurse on staff to administer a shot intermuscularly, and perhaps mechanical restraints, which would require the hiring of additional staff. She further testified that because these things were not feasible,

> if [W.M.] came back to the Jerome House we would allow him to run, we would probably not be able to follow him, and we would just have to let the city police deal with it and let [W.M.] be at large in the community.

She testified that W.M. was on medication for frontal lobe seizures and that when persons have seizure activities they are not in control of their physical movements or their mental capabilities. She also testified that, following a run, W.M. did not remember his actions on the run.

Did the District Court err in finding that W.M. was seriously developmentally disabled and in ordering him committed to MDC for one year?

Section **53-20-103(12),** MCA **(1989),** provides the following definition of "seriously developmentally disabled:"

> developmentally disabled due to developmental or physical disability or a combination of both, rendering a person unable to function in a community-based setting and which has resulted in self-inflicted injury or injury to others or the imminent threat thereof or which has deprived the person afflicted of the ability to protect his life or health.

Civil commitment for any purpose constitutes "a significant deprivation of liberty that requires due process protection." Addington v. Texas **(1979), 441** U.S. **418, 425, 99** S.Ct. **1804, 1809,** 60 L.Ed.2d **323, 330-31.** As a result, clear and convincing evidence is the standard of proof in a civil commitment proceeding. Addington, **441** U.S. at **433.**

W.M. cites Youngberg v. Romeo **(1982), 457** U.S. **307,** 102 S.Ct. **2452, 73** L.Ed.2d **28,** as authority that he has a constitutional right to receive minimally adequate habilitation and treatment necessary to afford him freedom from involuntary commitment. In doing so, he equates "freedom from undue restraint," Youngberg, **457** U.S. at **319,** with a right to community placement. The holding in Youngberg is not that broad. In Younsberg, the Court addressed the substantive due process rights of involuntarily committed retarded persons <u>within</u> <u>the</u> <u>institution</u>. The Court held that an involun-

6

tarily committed person "enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." Younsberg, 457 U.S. at 324. Several United States Circuit Courts of Appeal have held that there is no constitutionally-founded right of developmentally disabled persons to receive treatment in a community setting. Gieseking v. Schafer (W.D. Mo. 1987), 672 F.Supp. 1249, citing cases from the Second, Third, Fifth, and Seventh Circuits.

W.M. points out the statutory preference for community placement over institutionalization of developmentally disabled persons in Montana. Section 53-20-101, MCA. But that preference does not create an absolute right to community placement. The preference for community-based settings is to be given "whenever possible." Section 53-20-101(2), MCA.

W.M. claims that if the behavior management program used with him at MDC had been used in the group home, the placement would have been successful. On this basis, he maintains that it has not been proven that he was unable to function in a community-based setting.

The record reveals several immediate problems with that argument. Jan Paulsen from West Mont testified that

> [t]he part of the program that we did not implement was the punishment part. The part that would decelerate the behaviors. Taking away his tokens, his money, and

> physically restraining him, possibly mechanically re-
> straining him.  We are unable to initiate a program of
> that level of punishment until we have gone through a
> base line period and a reinforcement period.

In other words, Jerome House was unable to immediately use all components of the behavior management program used at MDC.

According to the written copy of the MDC program which was admitted into evidence, another part of the program used at MDC was an "accompanied walk with a staff member" when W.M. exhibited antecedent behaviors or tried to run away.  This part of the program would not be feasible with one staff person on duty at the group home, as was the case on the occasion when W.M. first ran away.  Also, Glen Cuchine from MDC testified that when W.M. ran from that facility, he was able to free up a number of staff persons to go find him.  Given the level of staffing at the group home, that procedure was clearly not always possible in that setting.

We conclude that after hearing the above testimony, it was not necessary that the District Court hear further testimony on the failure of the group home to duplicate the behavior management program used with W.M. at MDC.

W.M. points out that the emergency exit procedure set out in administrative rules at DD Policy 481.2 was not followed.  That policy relates to administrative dismissals from group home programs due to client behaviors.  In contrast, this was a judicial

proceeding initiated by a deputy county attorney, following the filing of criminal charges against W.M.

The petition to commit W.M. to MDC was filed under § 53-20-121, MCA (1989). That section allows a county attorney, at the request of a professional person, to file a petition alleging that a respondent is developmentally disabled and in need of developmental disability services. Section 53-20-122, MCA (1989), provides that, if the district court finds probable cause, it shall direct a professional person to examine the respondent and to make an inquiry concerning the circumstances of the case.

Section 53-20-123(1), MCA (1989), requires the professional person to report to the court in writing on whether the respondent is developmentally disabled and to make a recommendation for evaluation and treatment including an opinion on whether institutional or community-based services are required. That statute requires that the recommendation as to placement be based on consultation with the Department of Institutions and the Department of Social and Rehabilitation Services, and that the two departments develop written policies to implement this requirement. Section 53-20-125, MCA (1989), provides that if the professional person concludes that the respondent is seriously developmentally disabled and recommends treatment and habilitation in a residential facility on an extended basis, the professional person shall file the

9

written recommendation and report with the court and shall request that the court order the admission.

The record demonstrates that all of the procedural requirements of the above statutes were met. In addition, the petition for commitment advised W.M. of his procedural rights enumerated at § 53-21-115, MCA, as made applicable to developmentally disabled persons under § 53-20-112, MCA (1989).

In light of the unanimous opinion of the witnesses who testified at the commitment hearing that W.M. could not be served in a presently-existing group home setting, we hold that the District Court's determination that W.M. is seriously developmentally disabled and its decision to commit him to MDC are supported by clear and convincing evidence. W.M. has not shown that his procedural or substantive due process rights were violated. The order committing W.M. to MDC is affirmed.

. Chief Justice

We concur:

_____
John Conway Harrison

_____
Karla M. Gray

_____
William E. Hunt Sr.

_____
Terry Trieweiler

_____
R. C. McDonough

_____
                Justices

March 10, 1992

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

ANDREE LAROSE
Montana Advocacy Program
1410 Eighth Avenue
Helena, MT 59601

K. PAUL STAHL
Deputy County Attorney
Lewis and Clark County Courthouse
228 Broadway
Helena, MT 59601

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy