No. 04-064

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 340

IN THE MATTER OF T.W.,

Respondent and Appellant.

APPEAL FROM:     The District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DD 99-4,
Honorable Douglas G. Harkin, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Andrée Larose (argued) and Beth Brenneman, Staff Attorneys,
Montana Advocacy Program, Helena, Montana

Alexandra Volkerts, Staff Attorney, Montana Advocacy Program,
Missoula, Montana

For Respondent:

Paulette Kohman (argued), Special Assistant Attorney General,
Department of Public Health and Human Services, Helena, Montana

Honorable Mike McGrath, Attorney General, Helena, Montana

Leslie Halligan, Deputy County Attorney, Missoula, Montana

For Amicus Curiae:

James P. Reynolds, Helena, Montana (People First of Montana et al.)

Heard: November 3, 2004
Submitted: June 25, 2005
Decided: December 28, 2005

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 T.W. appeals from the order entered by the Fourth Judicial District Court, Missoula County, denying her motion for injunctive and declaratory relief. We affirm.

¶2 The following issues are dispositive on appeal:

¶3 Did the District Court err in concluding that § 53-20-132, MCA, was constitutional?

¶4 Did the District Court err in concluding that T.W. was not entitled to immediate placement in community-based services after her involuntary commitment expired?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Involuntary commitment of a seriously developmentally disabled person is governed by § 53-20-101 et seq., MCA. When a petition seeking commitment or recommitment of an individual to a residential facility is filed, the district court must refer the petition to a Residential Facility Screening Team (RFST), which undertakes an initial screening regarding whether the individual is "seriously developmentally disabled." Sections 53-20-125 and 53-20-133, MCA (2001). According to § 53-20-102(15), MCA (2001), "[s]eriously developmentally disabled" refers to a person who:

> (a) has a developmental disability;
> (b) is impaired in cognitive functioning; and
> (c) has behaviors that post an imminent risk of serious harm to self or others
> . . . who, because of those behaviors or deficits, cannot be safely and effectively habilitated in community-based services.

If the RFST reports that the individual is seriously developmentally disabled, then the court may consider commitment to a residential facility. Sections 53-20-125(1)(b) and 53-20-133(2), MCA. If the RFST does not recommend commitment to a residential facility, then

2

a district court is prohibited from committing the individual to such a facility. Sections 53-20-125(1)(b) and 53-20-133(2), MCA. In such situations, the district court may refer the individual to the Department of Public Health and Human Services (Department) "to be considered for placement in community-based services . . . ." Section 53-20-125(8), MCA. Section 53-20-132, MCA, prohibits district courts from ordering the direct placement of persons in community-based services, and instead requires that such placements be governed by the referral and selection process set forth in § 53-20-209, MCA, and, by reference, § 53-20-301 et seq., MCA. Pursuant to §§ 53-20-204 and 53-20-205, MCA (2001), the Department has adopted rules for the administration of community services and placements. *See* Rules 37.34.308–37.34.319, ARM.

¶6     T.W., a female in her mid-twenties, was admitted to the Montana Developmental Center (MDC) facility on an emergency commitment in November 1999. On November 29, 1999, the RFST reported that T.W. was mildly mentally retarded, exhibited behaviors that presented "a risk of serious harm to herself and others"—including self-mutilation and assaultive tendencies—had cognitive delays and poor memory, and was seriously developmentally disabled. On December 22, 1999, the District Court ordered that T.W. be involuntarily committed to MDC for one year to receive an extended course of treatment and habilitation. Thereafter, T.W. was recommitted to MDC pursuant to the statutory process for additional one-year commitments on January 5, 2001, and May 21, 2002. This latter one-year commitment was scheduled to expire on May 21, 2003. In November 2002, T.W.'s treatment team at MDC referred her for community placement, recommending that T.W. be

placed in an intensive supported living environment with roommates in a group home or duplex that had twenty-four hour staffing and close supervision. Despite this recommendation, the State filed a petition seeking recommitment of T.W. to MDC.

¶7 On June 3, 2003, pursuant to the statutory referral procedure, the RFST completed its evaluation and issued a report which concluded that T.W. had made substantial improvement at MDC and was no longer seriously developmentally disabled:

> The [RFST] is in consensus that [T.W.] is **no longer seriously developmentally disabled.** She has benefited greatly from the structure, supervision and counseling she has received at the Montana Developmental Center and is no longer exhibiting the behaviors that put her and others at risk.
>
> . . . .
>
> From December 1, 2001 until September 30, 2002, she had 6 incidents of physical aggression, compared to 34 the previous year. She had 21 incidents of verbal aggression compared to 87 the previous year, and she had 4 incidents of self-injurious behavior compared to 16 the previous year. She was seen in psychiatric clinic 9 times in the past year. By taking part in the one-to-one counseling and group sessions she has addressed some very difficult issues and has gained insight into her own problems as well as the problems her peers encounter. . . . She handles her anger more effectively than she used to.

In consideration of T.W.'s significant progress, the RFST did not recommend recommitment to MDC, and, despite some difficulties which T.W. continued to experience, assessed T.W.'s qualifications for placement as follows:

> REFERRAL STATUS: She is referred for community-based services. Her team noted that she has made an effort to work through her issues and has made significant progress in the last year. She is noted as still needing 24-hour awake staff because of suicide threats and actions, runaways, self-injurious and violent behavior.

¶8 Two days after the issuance of this report, the State filed a motion requesting that the District Court adopt the RFST's recommendation. However, the District Court did not immediately rule on the motion. In the meantime, although her commitment order expired in May of 2003, T.W. remained at MDC.

¶9 On August 8, 2003, T.W. filed a motion requesting declaratory and injunctive relief with the District Court. T.W. sought injunctive relief to compel the State to immediately place her in a community-based service, arguing that the State's failure to do so "left her with no option but to remain in institutional confinement—in a de facto involuntary commitment." T.W.'s motion also sought a declaratory judgment that § 53-20-132, MCA, was unconstitutional insofar as it prohibited a district court from ordering the State to provide her with community services.

¶10 On October 17, 2003, the District Court issued an order which found that T.W. was no longer seriously developmentally disabled, adopted the recommendations of the RFST and dismissed the recommitment petition. The court also found that T.W. was not being held involuntarily and denied T.W.'s motion for injunctive and declaratory relief. On December 15, 2003, T.W. filed a notice of appeal.

## STANDARD OF REVIEW

¶11 Our review of the constitutional issue of due process, a matter of law, is plenary. *Forsythe v. Leydon*, 2004 MT 327, ¶ 5, 324 Mont. 121, ¶ 5, 102 P.3d 25, ¶ 5. "A party challenging the constitutionality of a statute must prove the statute unconstitutional beyond a reasonable doubt." *Ravalli County v. Erickson*, 2004 MT 35, ¶ 17, 320 Mont. 31, ¶ 17, 85

5

P.3d 772, ¶ 17. "The constitutionality of an enacted legislative statute is prima facie presumed." *Ravalli County*, ¶ 17.

## DISCUSSION

**¶12 Did the District Court err in concluding that § 53-20-132, MCA, was constitutional?**

¶13 As an initial matter, we note that, in April 2004, T.W. was accepted for placement by a community-based developmental disabilities service provider and, at the time this matter was argued, was residing in a group home. Consequently, she had resided at the MDC for approximately eleven months following the expiration of her commitment prior to being placed with a community-based service provider. T.W.'s demand for injunctive relief providing immediate placement in community-based services was mooted when she was placed during the course of her appeal. However, we deem the claim she advanced as one "capable of repetition . . . which could evade review," an exception to the mootness doctrine. *Cape v. Crossroads Corr. Ctr.*, 2004 MT 265, ¶ 25, 323 Mont. 140, ¶ 25, 99 P.3d 171, ¶ 25. Therefore, we undertake consideration of T.W.'s arguments.

¶14 T.W. asserts that § 53-20-132, MCA, is unconstitutional because it does not allow the district courts to directly place or order the State to place individuals within community services following expiration of their involuntary commitments. The statute states:

> Nothing in this part may be construed as authorizing the placement of and delivery of services to persons with developmental disabilities in community-based services by court order. Placement of persons in community-based services is governed by 53-20-209.

Section 53-20-132, MCA.

¶15 T.W. defines her stay at MDC after her commitment expired as a "de facto commitment" to that institution, and argues that § 53-20-132, MCA, is a "legislative ban" on "the only remedy" which will end her de facto commitment, that is, a judicial order of placement. She argues the statute renders her fundamental constitutional rights meaningless, because the courts cannot be utilized to enforce her rights, thus violating the access to justice protections of Article II, Section 16 of the Montana Constitution.[1] T.W. asserts that the statute constitutes arbitrary and discriminatory state action which must be viewed "against the backdrop of historical segregation and isolation of people with disabilities. The practices of state officials today are vestigal [sic] fruits of this historical legacy." Lastly, T.W. claims that "sanism"—an invidious, almost invisible and publicly acceptable type of discrimination against those with developmental disabilities—is evidenced by the application of § 53-20-132, MCA.

¶16 The State responds that § 53-20-132, MCA, simply reinforces the statutory and regulatory scheme that requires individuals to seek community-based services through the administrative process[2]—a remedy which was overlooked or ignored by T.W. The State

---

[1]Art. II, Sec. 16, provides, in part: "Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character."

[2]Rules 37.34.306–37.34.308, ARM, provide some of the available remedies, including a referral package that must be complied with within thirty calendar days of a decision by a disabled person's planning team to refer the person for community placement and review of referrals by a screening committee. In addition, the disabled person has the right to review a placement decision by the developmental disabilities review board, and may appeal an adverse decision by that board and obtain a fair hearing. Rule 37.34.335(1)–(5), ARM. An adverse decision following a fair hearing may be appealed within fifteen days to the Board of Public Assistance, and thereafter, judicial review may be sought in the district court within thirty days. Rules 37.5.331 and

7

explains that the judiciary maintains an active role by deciding whether to refer an individual to the Department to be considered for placement in community-based services under §§ 53-20-125(8) and 53-20-128(8), MCA, and by reviewing adverse placement decisions by way of petitions for judicial review following administrative action. The State argues that the record is devoid of evidence to support T.W.'s allegations and that she therefore did not meet the burden of proving § 53-20-132, MCA, unconstitutional beyond a reasonable doubt.

¶17　With sincere regard to the concerns T.W. has expressed about discrimination against or ill treatment of the disabled, we nonetheless must reject the constitutional challenge to § 53-20-132, MCA, as presented herein. The challenge is faulty in that it ignores Montana's unique constitutional history and fails to recognize the statute as one piece of a broader system created by the Legislature to provide community-based services, pursuant to constitutional authority.

¶18　In 1986, this Court struck down a statute which limited general assistance payments as violative of Article XII, Section 3 of the Montana Constitution, as it was then constituted,[3] concluding that "Art. XII, Section 3(3) directs the Legislature to provide necessary assistance to the misfortunate." *Butte Cmty. Union v. Lewis* (1986), 219 Mont. 426, 434, 712 P.2d 1309, 1313. In response, the Legislature referred Constitutional Amendment No. 18 to the

37.5.334, ARM. At that time, the judiciary is empowered to review the administrative process, and, at that point, it may determine whether a disabled person has been deprived of placement on impermissible grounds under the eligibility criteria.

[3] As originally enacted, Article XII, Section 3 provided that: "[t]he legislature shall provide such economic assistance and social and rehabilitative services as may be necessary for those inhabitants who, by reason of age, infirmities, or misfortune may have need for the aid of society."

8

citizens of Montana, who, on November 8, 1988, voted to amend Article XII, Section 3. The amended article provides as follows:

> (3) The legislature *may provide* such economic assistance and social and rehabilitative services for those who, by reason of age, infirmities, or misfortune *are determined by the legislature to be in need*.
> (4) The legislature *may set eligibility criteria* for programs and services, as well as for the duration and level of benefits and services.

Article XII, Section 3 (emphasis added). In contrast to the previous, mandatory language—"shall provide"—Article XII, Section 3, as amended, now contains permissive language with regard to the Legislature's provision of social and rehabilitative services. The amended Article grants the Legislature express authority to determine what forms of assistance will be available and to set the eligibility criteria for those services. It is these specific constitutional provisions arising from our unique constitutional history which we must today apply.

¶19 Pursuant thereto, the Legislature has enacted the current statutory scheme, set forth in Title 53, which designates the forms of public assistance to be made available and which governs the provision thereof. In that regard, still in furtherance of its express constitutional authority, the Legislature determined that community-based services to persons with disabilities would be provided by way of an administrative process, as opposed to a direct judicial order. Section 53-20-132, MCA. While the Legislature declared, as a matter of public policy, a preference for community placement of such individuals over institutionalization, *see* § 53-20-101, MCA, this Court has clarified that this preference did not create "an absolute right to community placement. The preference for community-based

9

settings is to be given 'whenever possible.'" *In re W.M.* (1992), 252 Mont. 225, 229, 828 P.2d 378, 381.

¶20 T.W.'s arguments barely acknowledge the administrative process created by the Legislature, offering only that the process is "an administrative one in which judicial intervention is viewed with disdain." This statement is made without evidentiary support, perhaps because there was little or no factfinding herein due to the procedural path this case has taken, including the failure of T.W. to seek relief through the administrative process, discussed further below. In any event, § 53-20-132, MCA, is not a stand-alone provision which simply bars all access to community-based services; it is but one part of an overall program the Legislature has created for the administration of these services, including both statutory and administrative components. The Legislature's decision to create an administrative process for provision of services, to require the disabled person to seek services within that process, and to prohibit judicial placements, was made pursuant to specific constitutional authority granted by Article XII, Section 3.

¶21 Thus, T.W.'s challenge to § 53-20-132, MCA, as an unconstitutional bar to services and to the courts is flawed, in part, because it attacks the statute in isolation. It fails to recognize the statute works in tandem with the administrative process, which determines what services can be provided to each individual applicant. T.W.'s challenge also fails to recognize that a person who is denied services in the administrative process has a right of administrative appeal, and if necessary, of judicial review in the district court, *see* Rules 37.5.331 and 37.5.334, ARM, and, ultimately, in this Court. In failing to recognize these

remedies, of course, T.W. offers nothing to demonstrate that the remedies are in any way constitutionally deficient.

¶22   In light of the specific directives of Article XII, Section 3, and the overly narrow focus of T.W.'s challenge, we must conclude that § 53-20-132, MCA, is facially constitutional. It is clear that T.W.'s argument, that this statute bars her "only remedy," is inaccurate: it ignores the very administrative remedies, discussed further below, she could have pursued to address her claim of delayed placement.

¶23   **Did the District Court err in concluding that T.W. was not entitled to immediate placement in community-based services after her involuntary commitment expired?**

¶24   It is not disputed by either party that T.W. was accorded due process when she was originally committed to MDC pursuant to the commitment statutes. However, T.W. contends that her constitutional rights were violated when she was not immediately placed within community-based services following the expiration of her commitment, asserting that her stay at MDC was a "de facto commitment." T.W. cites to *Clark v. Cohen* (E.D. Pa. 1985), 613 F.Supp. 684, and *Thomas S. by Brooks v. Morrow* (W.D.N.C. 1984), 601 F.Supp. 1055, to establish that individuals remaining in an institution beyond the time needed for the appropriate care are suffering from unnecessary confinement. T.W. therefore contends that because the State did not provide for her immediate placement, her institutionalized care was, by definition, unnecessary and a violation of her rights to due process, dignity, privacy and equal protection, and that the District Court erred in denying her request for placement.[4]

---

[4]The District Court also suggested that T.W.'s remedy was to bring an *Olmstead* claim—referring to a 1999 United States Supreme Court case which held that disabled residents have the right to not be unjustifiably retained in an institution if community-

¶25    The State responds that T.W. was not "de facto committed" to MDC, but that her stay at the institution following the expiration of her commitment was voluntary. Asserting that there is no constitutional right to immediate placement, and citing to our holding in *In re W.M.*, 252 Mont. at 229, 828 P.2d at 381, the State argues that substantive due process does not require immediate placement in community-based services. It notes that T.W. did not identify any authority regarding what process is due when a person continues to reside at the MDC voluntarily upon expiration of a judicial commitment, or attack the statutory requirements with which the Department was in full compliance.[5] The State argues that T.W. improperly relies upon *Clark* and *Morrow* because those cases involved deplorable conditions at a variety of institutions in which persons with developmental disabilities were detained without court intervention, subjected to inhumane conditions and were deprived of treatment. Finally, the State claims that T.W. sought immediate placement in a community setting by court order instead of following the administrative process for placement as designed by the Legislature.

_____

based treatment is available as a resource to the state. *Olmstead v. Zimring* (1999), 527 U.S. 581, 607, 119 S.Ct. 2176, 2190, 144 L.Ed.2d 540, 562  The United States Supreme Court likewise recognized that if a state "demonstrates that it ha[s] a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that move[s] at a reasonable pace . . ." the state is not violating Americans with Disabilities Act (ADA) obligations. *Olmstead*, 527 U.S. at 605-06, 119 S.Ct. at 2189, 144 L.Ed.2d at 561. T.W.'s claims are not made under the ADA.

   [5] Sections 53-20-127 and 53-20-141–53-20-165, MCA, provide for periodic review and placement planning for all MDC residents.

12

¶26 T.W.'s challenge to the District Court's decision thus begins with a factual issue—that the District Court erred when it found that she was not being involuntarily held at MDC following the expiration of the commitment order on May 22, 2003. T.W. contends that "there is no evidence to support a conclusion that T.W.'s stay at MDC is voluntary" and because she had "no other alternative available," T.W.'s continued stay at MDC was a de facto commitment to the institution. The State takes the exact opposite position—that the only substantial evidence herein established that T.W. had the opportunity to consult with her counsel, her guardian and the treatment staff and that she "decided to stay on after her commitment expired because she wanted to have community-based services in place before leaving the protective environment of MDC. This is consistent with voluntary residency and does not infringe upon her due process liberty interests."

¶27 As we have noted, there was little or no "factfinding" completed in this matter. The evidence surrounding this case is minimal, a problem created by T.W.'s failure to participate in the administrative process. A person who is denied placement services is entitled to a fair hearing following the adverse decision. Rules 37.5.115(1) and 37.34.226(1), ARM. Evidence will be taken and a record preserved, to be used for a subsequent administrative appeal or for judicial review. Here, however, a proceeding was initiated in the District Court by motion without exhaustion of administrative remedies. The factual information submitted to the District Court consisted largely of reports, affidavits and responsive affidavits.

¶28 Addressing the factual dispute regarding the voluntariness of T.W.'s post-commitment stay at MDC, the District Court held:

13

[T.W.]'s own affidavit fails to specifically allege that she is being held against her will; rather, [T.W.] alleges that she knows she is no longer committed but that she "cannot leave," because has no where else to go. [T.W.]'s affidavit does not clearly reveal that she cannot leave because she is being held against her will, as counsel alleges in the brief in support of declaratory ruling.

. . . .

The State has submitted the affidavit of Leigh Ann Leary, a Qualified Mental Retardation Professional at MDC who testified that [T.W.] is currently residing at MDC on a voluntary basis while awaiting community-based services . . . .

. . . .

[T.W.] has not provided any meaningful dispute to the allegations contained in Ms. Leary's affidavit.

¶29 Based on the minimal record, the District Court's "finding" that T.W. was not involuntarily held at MDC cannot be said to be clearly erroneous as unsupported by substantial evidence. Upon the expiration of T.W.'s commitment, the State had no legal hold on her, and she was free to leave the institution. Although T.W. asserts that she was not content at MDC and wanted to leave, it was clear that her continued stay resulted from, not a legal restraint, but a practical one: she lacked personal or family resources or other assistance to provide a place to reside outside MDC. She therefore elected to wait at MDC until a community-based placement could be provided by the State.

¶30 Upon such a factual premise, we cannot conclude that T.W.'s substantive due process rights were violated. As the State notes, this Court held in *In re W.M.* that a developmentally disabled person did not have a constitutional right to receive treatment in a community-based setting. *In re W.M.*, 252 Mont. at 229, 828 P.2d at 381. There is a

14

preference for community placement over institutionalization, but the preference must only be given "whenever possible." *In re W.M.*, 252 Mont. at 229, 828 P.2d at 381 (citing § 53-20-101(2), MCA).

¶31    Additional factual development may affect the analysis, and further, T.W. offers other constitutional arguments. However, a fundamental problem arises from T.W.'s failure to exhaust her administrative remedies—that is, our inability to determine whether a statute or its corresponding administrative regulations violates her constitutional rights in application. Although claiming a violation of rights, T.W. did not avail herself of the very system which could have prevented or remedied those violations. "[B]efore a party can seek declaratory relief in district court, it must exhaust its administrative remedies." *Mt. Water Co. v. Dept. Pub. Serv. Regulation*, 2005 MT 84, ¶ 14, 326 Mont. 416, ¶ 14, 110 P.3d 20, ¶ 14.

¶32    A review of the administrative process created by the Legislature reveals that it was designed to address the specific complaints T.W. now raises. For example, Rule 37.34.308(1), ARM, requires that the Department base community placement upon "whether the person has been inappropriately placed in an institution," "whether the person is in a service that is inappropriate," and "whether [current services] are meeting the person's needs." Thus, T.W. had the right to seek placement for the reasons that her condition had improved to the point she no longer needed commitment to MDC, she had been recommended for community placement, and that her commitment had expired. She had the right to be advised of any adverse decision and her right to appeal therefrom. Rule 37.34.335, ARM. She had the right to be represented by an advocate and to be given notice

15

of the decision after appeal. Rule 37.34.335, ARM. Lastly, as mentioned above, T.W.'s rights included judicial review by the courts if her administrative appeal was unsuccessful. However, she failed to pursue this relief.

¶33 As a consequence, we cannot undertake and determine whether T.W.'s individual constitutional rights, such as privacy, were violated as a result of the delay in her placement in community-based services. Her failure to seek relief provided by the system prevents us from determining whether, as applied to her, that system violated her rights. It is possible that future cases may present an opportunity to assess whether an individual's rights were violated following exhaustion of available administrative remedies. However, in this case, T.W. failed to do so.

¶34 Affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/INGRID GUSTAFSON
Honorable Ingrid Gustafson, District Judge,
sitting in place of former Justice Jim Regnier

16

Justice Patricia O. Cotter concurs.

¶35    I join the Court's Opinion today with reluctance.  But for the language of Article XII, Section 3(3) of the Montana Constitution, I would be joining the Dissent.  However, as the Court notes at ¶ 19, the citizens of Montana voted in 1988 to amend the Montana Constitution to relax the responsibility of the State towards the developmentally disabled. Whereas before the State was obligated to provide the assistance such persons required, now the State "may provide" such services for these persons, and "may set eligibility requirements" for their services (Article XII, Section 3(4)), as it deems appropriate. Under this new version of Article XII, Section 3(3) and the implementing statutes, the Department has the discretion to determine which services it will extend and how eligibility for those services will be determined.

¶36    The Dissent would conclude that § 53-20-132, MCA, is unconstitutional in that it denies individuals in T.W.'s position the ability to redress via access to the courts the State's failure to timely provide them with community-based services.  Dissent, ¶ 13. The problem is that neither the Constitution nor the implementing laws require the Department to extend community-based services, much less do so in a timely manner. Any reviewing court would be compelled to acknowledge as much.  Given that under the present scheme, the Department has wide discretion when it comes to placement decisions, and the Legislature has been constitutionally granted the discretion to either extend or deny benefits in the first instance, a court of review would have little to analyze

17

and even less to decide. Thus, while I would otherwise decry the denial of access to the courts, here the fact is that the courts, if authorized to act, would have nowhere to go.

¶37 This Court and the district courts are circumscribed by the present provisions of Article XII, Section 3(3) of our Constitution, whether we deem them well- or ill-advised. It is for this reason that I concur.

/S/ PATRICIA O. COTTER

District Court Judge Ingrid Gustafson joins in the concurrence of Justice Patricia O. Cotter.

/S/INGRID GUSTAFSON
Honorable Ingrid Gustafson, District Judge,
sitting in place of retired Justice Jim Regnier

Justice W. William Leaphart, dissenting.

¶38 I dissent.

¶39 The Court's conclusion that the State's treatment of T.W. does not violate due process ignores the State's duty to rectify a wrong that it has created. The State placed T.W., against her will, in MDC. In doing so, it restricted her right to physical liberty, a right fundamental under the Montana Constitution. *See Matter of C.H.* (1984), 210 Mont. 184, 201, 683 P.2d 931, 940. Having done this, the State cannot simply continue to house T.W. as though she remains a committed patient. It is true that when the State determined that T.W. was no longer "seriously developmentally disabled" she was free to leave

20

MDC. However, her "exit" from MDC was not quite as simple as a released prisoner walking out the jailhouse door.

¶40 T.W. continued to live at MDC because she quite literally had nowhere else to go. The State initially confined her knowing that she required round-the-clock care, and knowing that at the end of her time at MDC she, in all likelihood, would still require round-the-clock care. In fact, even before the State first committed T.W., she was living in a community-based group home. Although the record illustrates that her stay at MDC may have improved her lot in life (as she apparently was no longer "seriously developmentally disabled"), it unsurprisingly did not improve it to the point where she could saunter forth and make her way in society. In involuntarily committing T.W. to MDC, the State created a dependency. As a result of this dependency, T.W., although legally at liberty to leave the institution, had no realistic choice but to continue her residence there.

¶41 Having *created* this dependence on institutional living, the State has a duty to wean T.W. from that state of complete reliance. This duty arises out of our State's Due Process Clause, a provision of our Constitution that the Court today ignores.

¶42 The federal courts have recognized that although the Due Process Clause of the Fourteenth Amendment generally does not impose a positive duty upon the States to assist their citizens, in certain contexts it and the Eighth Amendment require that states provide some affirmative assistance. *See, e.g.*, *Youngberg v. Romeo* (1982), 457 U.S. 307, 315-16, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28, 37; *Estelle v. Gamble* (1976), 429 U.S.

21

97, 103-04, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251, 259-60 (duty to provide adequate medical care to prisoners). Particularly pertinent to this case, *Youngberg* interpreted the Due Process Clause as requiring that states provide committed individuals with "adequate food, shelter, clothing, and medical care," as well as "minimally adequate or reasonable training to ensure safety and freedom from undue restraint" while committed. *Youngberg*, 457 U.S. at 315, 319, 102 S.Ct. at 2457-58, 2460, 73 L.Ed.2d at 36-37, 39. Although the State is correct in arguing that the federal courts have not interpreted *Youngberg* as mandating community-based services in a situation such as T.W.'s, few have had the opportunity. Although numerous courts have stated that there is no due process right to community placement, these decisions have often been in the context of a currently committed individual, not of an individual who has been released from commitment and who has nowhere else to go. *See, e.g., Society for Good Will to Retarded Children v. Cuomo* (2nd Cir. 1984), 737 F.2d 1239, 1242, 1249; *Phillips v. Thompson* (7th Cir. 1983), 715 F.2d 365, 368. It appears that only one federal district court has squarely held that a state has no constitutional obligation to a previously involuntarily committed individual once that individual is allowed to leave. *K.L. v. Edgar* (N.D. Ill. 1996), 941 F.Supp. 706, 716.

¶43    While we have recognized that there is no right to community-based services, *per se*, under the Montana Constitution, before today we have not ruled on whether the State denies due process to a person in T.W.'s post-commitment situation if it refuses to extend those services to her. *See Matter of W.M.* (1992), 252 Mont. 225, 229, 828 P.2d 378, 381

22

(recognizing there is no right to community placement for a patient currently involuntarily committed).[1] We have recognized, however, that where a government official establishes a "special relationship" with an individual involving custody over that individual, the official involved may owe the individual a duty of care. *See Nelson v. Driscoll*, 1999 MT 193, ¶ 35, 295 Mont. 363, ¶ 35, 983 P.2d 972, ¶ 35 (listing relationships, including hospital-patient). We have also recognized such a duty in the due process context under the "state-created danger theory." *Nelson*, ¶ 54. In addition, the Restatement (Second) of Torts states that when an actor is required by law to take custody of another individual, the actor is then obligated to protect that individual. *See* Restatement (Second) of Torts § 314A. This is because in taking the individual into custody the actor "deprive[s] the other of his normal opportunities for protection," and makes the individual reliant on him. Restatement (Second) of Torts § 314A(4); *see also Graham v. Montana State Univ.* (1988), 235 Mont. 284, 288, 767 P.2d 301, 303.

---

[1] Recognizing that T.W. has a constitutional right to timely community-based services would not overturn our holding in *Matter of W.M.* Any claim T.W. has to such services, when such services are already provided, is mandated by the Due Process Clause and is a narrow exception to the language of *Matter of W.M.* As the Court argues, developmentally disabled individuals who have not been released from commitment do not have a constitutional right to community-based services. Article XII, Section 3(3), Montana Constitution states, "The legislature *may* provide . . . social and rehabilitative services for those who, by reason of . . . infirmities . . . are determined by the legislature to be in need." (Emphasis added.) In *Matter of W.M.* the State had not created a system of community-based services for individuals such as W.M. (those currently involuntarily committed). Here, the State *has* created a system of community-based services for those who have been *released* from involuntary commitment, but the timing of those services raises due process concerns.

¶44    There is no dispute that in this case MDC established a custodial "special relationship" with T.W. and deprived her of her "normal opportunities for protection." The special relationship is on-going and mandates that MDC provide T.W. with affirmative assistance, including adequate food and medical care, matters also mandated by the Fourteenth Amendment. *See* discussion of *Youngberg*, above.  Requiring MDC to provide T.W. with community placement once it decides she should no longer be committed is consonant with these already recognized duties.  Having taken T.W. away from community placement and institutionalized her, the State burdened itself with the duty of making T.W. whole.

¶45    Our sister court in New Jersey has addressed this subject in depth.  When faced with a similar situation—previously involuntarily committed individuals who are free to go but do not have the means or capacity to do so—it reasoned that the State must continue to provide for them and give them community placement.  We quote from its opinion at length:

> Although legally entitled to leave the mental hospital, [the patients] are incapable of competently exercising that right due, in part, to the effects that prolonged confinement has had on their own personal capacity to survive in the outside world and on their relationships with friends and family who might provide support and assistance. The State cannot simply pull the rug from under these people when they physically deteriorate to a point where they are no longer dangerous. Although the State does not have the authority to continue the legal commitment of the appellants, it is not required to cast them adrift into the community when the individuals are incapable of survival on their own. In a proper exercise of its *parens patriae* authority, it may therefore of necessity continue the confinement of such persons on a provisional or conditional basis to protect their essential well-being, *pending efforts to foster the placement of these individuals in proper supportive settings outside the institution*.

*In Re S.L.* (N.J. 1983), 462 A.2d 1252, 1258 (concluding emphasis added). Contrary to *S.L.*, there is no suggestion in the case *sub judice* that the State wanted T.W. to leave MDC before she was assigned a community placement, nor any suggestion that the State sought to continue her confinement. This does not mean, however, that the State fulfilled its constitutional obligations under the reasoning of *S.L.* The New Jersey court expedited the placement of the *S.L.* patients, ordering that a patient who has been released but determined to have nowhere to go be granted a hearing within sixty days of that determination, and then every six months thereafter. *S.L.*, 462 A.2d at 1258. At the hearing an inquiry must be made into what placement is best for the patient and the State's efforts to find a placement. If the patient is still residing in the institution after six months, and the State continues to argue that "placement is not possible" then "the court must determine whether the State has undertaken all good faith efforts necessary to place the individual in an appropriate setting outside the mental institution and whether in the interim the State has placed the individual in the least restrictive setting in the institution." *S.L.*, 462 A.2d at 1258-59.

¶46    It is agreed that, "T.W. was dangerous when she entered MDC and her condition substantially improved while she was in the State's care." It would be a mistake, however, to equate "T.W.'s improvement" with being independent. The institutional environment can facilitate improvement and, at the same time, create reliance or dependency. Although T.W. had improved, she was far from independent when she was referred for placement. It was noted that T.W., upon release, was "still needing 24-hour awake staff because of suicide threats and actions, runaways, self-injurious and violent

25

behavior."

¶47 In relying on the permissive language of Article XII, Section 3, of the Montana Constitution, to conclude that T.W. has not been denied due process of law, the Court ignores the fact that the Legislature has already established a system of rehabilitative services through community care. Further, pursuant to that system, it has been determined that T.W. is eligible for such care. Were the Court to conclude that T.W. has been denied due process, it would not be co-opting or "superseding" the Legislature's constitutional prerogative to offer the rehabilitative service (the services are in fact offered) or to determine eligibility (T.W. has been deemed eligible). Rather, the issue here is, having established a system of community-care, must the State administer that system consistently with the other provisions of the Constitution? Although the Constitution allows the State the option of not providing a system of community-care at all, the State cannot create a program (as it has) and then administer the community-based care program in such a manner that it violates a patient's right of privacy, right to equal protection or right to be free from cruel and unusual punishment. Presumably the Court would agree that Article XII, Section 3, although couched in permissive language, does not open the door to discrimination on the basis of religion; that the State must offer the services to members of all religions, consistently with the guarantee of freedom of religion in Article II, Section 5. So too must not it administer the community-based services program consistently with the Due Process Clause of Article II, Section 17, by offering the services in a timely manner? Is the Court arguing that in amending Article XII the voters of this State voted to rescind T.W.'s right to due process?

26

¶48 The Court asserts that T.W. failed to avail herself of administrative remedies and, ultimately, judicial review. The Court's detailed reading of the Department's administrative rules does not alter the fact that in pursuing community care T.W. is totally subject to the mercy of the State. Section 53-20-132, MCA, states, "Nothing in this part may be construed as authorizing the placement of and delivery of services to persons with developmental disabilities in community-based services by court order. Placement of persons in community-based services is governed by 53-20-209." In turn, § 53-20-209, MCA, states that if the State determines "that a person with developmental disabilities is in need of *available* services *and* those services *can* be provided to him, the department *may* provide services *available* under this part and Title 53, chapter 20, part 3." (Emphasis added.) The sheer number of qualifications in this language illustrates that under the State's statutory scheme, an individual may only obtain community-based services if the State (1) has such services available, and (2) chooses to provide them. These restrictions apply alike to individuals who have been committed and to those who have never been committed. Given the State's unfettered discretion, the offer of judicial review is a mirage. A court would be hard put to conclude that the Department, no matter what it did or did not do, abused its *carte blanche* grant of authority.

¶49 Again, due process requires that the State provide an individual in T.W.'s situation (a previously involuntarily committed individual who is free to leave the institution but does not have the means or capacity to do so) with community-based services in a timely manner. However, if the State fails to provide such services, § 53-20-132, MCA, prevents the individual from seeking a court order to obtain them. The prohibition on

27

court-ordered placement in § 53-20-132, MCA, would not present a problem if the State had a scheme in place where individuals such as T.W. are provided community-based services in a timely manner. However, such a scheme does not exist. Instead, the State, at its own discretion, chooses whether, and when, to give these individuals community-based services. Because the State does not assure placement at any time or in any manner, the statutory bar on court-ordered relief deprives post-commitment individuals such as T.W. of a remedy. Of course, since the Court concludes that the State has done no wrong, it need not be worried of a remedy.

¶50   "Montanans' fundamental rights to a jury trial, to due process and to equal protection, among others, are rendered meaningless absent the courts being able to enforce these rights." *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 58, 310 Mont. 123, ¶ 58, 54 P.3d 1, ¶ 58 (Nelson, J., joined by Trieweiler, J., Leaphart, J., and Cotter, J., specially concurring). Article II, Section 16, of the Montana Constitution mandates that, "Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character." Section 53-20-132, MCA, violates this fundamental right. It denies individuals in T.W.'s position the ability to redress the State's failure to timely provide them with community-based services.

¶51   I would reverse the judgment of the District Court.


                                        /S/ W. WILLIAM LEAPHART

28

Justice James C. Nelson joins the dissent of Justice Leaphart.

/S/ JAMES C. NELSON

Justice James C. Nelson, dissenting.

¶52    I join Justice Leaphart's well-reasoned dissent.    I offer one further observation. The Court seems to take great comfort in holding that the rights of persons like T.W. will be protected by the Department's administrative scheme.    Putting the burden of exhausting that scheme on developmentally disabled people might, in theory, be acceptable if each was appointed an experienced and knowledgeable attorney to shepherd him or her through the system as soon as he or she entered it.    To expect developmentally disabled persons to navigate that water alone, however, is the worst sort of pie-in-the-sky. It will inevitably lead to the sort of institutional abuse demonstrated in the case at bar.

¶53    I, too, dissent.

/S/ JAMES C. NELSON