No. 04-248

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 305

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

DONALD L. SHEEHAN,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the Seventh Judicial District,
                     In and For the County of Richland, Cause No. DC-2003-14,
                     Honorable Katherine M. Irigoin, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

             William F. Hooks, Attorney at Law, Helena, Montana

        For Respondent:

             Honorable Mike McGrath, Attorney General; Micheal S. Wellenstein,
             Assistant Attorney General, Helena, Montana

             Mike Weber, County Attorney, Sidney, Montana

                            Submitted on Briefs:  January 26, 2005

                                     Decided:  December 6, 2005

Filed:

_____
                         Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Donald Lee Sheehan ("Sheehan") appeals his conviction in the District Court for the Seventh Judicial District, Richland County, of driving while under the influence of alcohol ("DUI"), fourth or subsequent offense, a felony.  We affirm.

¶2     Sheehan raises the following issue on appeal:

¶3     Did the District Court err, and thereby violate due process, by denying defendant an opportunity to present an alternative scenario at trial to explain his apparent state of intoxication?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     During the early morning hours of February 20, 2003, Anna Christenson, Eddie Cook, and Arnot Schmitt ("Christenson," "Cook," and "Schmitt") were returning to Sidney, Montana, on Montana Highway 16.  About three miles south of town, they came upon Sheehan, who was jumping up and down on the side of the highway and waving as though he needed help.  Christenson stopped the car, and they got out to offer assistance.

¶5     They noticed that Sheehan appeared to be injured.  He had blood on his forehead and nose, his hands were cut up, and he had some trouble walking.  Christenson observed that Sheehan's speech was slurred, and when Cook and Schmitt got within about three feet of Sheehan, they smelled the odor of an alcoholic beverage.  The three deduced that Sheehan had been involved in a car accident or a fight, although Sheehan denied it.  He stated that he had shot himself and needed a ride to the hospital.  Although seeing no gunshot wound, the three took the claim seriously and drove Sheehan to the Sidney Health Center.

2

¶6 Upon arriving, Sheehan was admitted to the emergency room, where Holly O'Connor ("O'Connor" or "Nurse O'Connor"), the charge nurse, observed Sheehan's injuries, the odor of alcohol coming from Sheehan and his disorientation, concluding that he was intoxicated. A physical examination of Sheehan revealed a spot of dried blood about one centimeter across located in the upper right quadrant of his abdomen, and x-rays confirmed the presence of a .22 caliber bullet in that area. As a result, he was taken to surgery, although the slug was not recovered.

¶7 Due to Sheehan's gunshot wound, Nurse O'Connor contacted law enforcement, and Officer Arnson and Officer Rosaaen of the Sidney Police Department responded. Upon arriving, Officer Arnson asked Sheehan where the shooting incident had taken place, and he initially advised her "that he did not want to get a DUI." Later, however, he stated that he had shot himself three or four hours prior to arriving at the Sidney Health Center, and that after shooting himself, he had gone to the Cattle-ac bar, where he had been drinking and had gotten into a fight. He informed Officer Arnson that the gun used in the shooting was in the vehicle he had been driving.

¶8 Officer Rosaaen read Sheehan the Implied Consent Advisory, and Sheehan agreed to provide a sample of his blood for the purpose of testing his blood alcohol concentration ("BAC"). His blood was drawn at 2:45 a.m., and an analysis of the sample by the state crime lab disclosed a BAC of 0.12 grams of alcohol per 100 milliliters of full blood. A second blood test was administered around that same time by hospital personnel in conjunction with Sheehan's surgery, and the results of that test revealed a BAC of 0.18.

3

¶9 The vehicle Sheehan had been driving was found the next day, about three miles south of Sidney. Deputy Gary Hofer of the Richland County Sheriff's Office, who conducted the accident investigation, determined that the vehicle had been traveling north on Highway 16 and, upon reaching a curve or bend in the highway, had continued in a straight line across the southbound lane and off the pavement. In other words, he determined that the driver had missed the curve and driven straight off the west side of the road. The vehicle then had gone down a slope and through some brush and trees, finally coming to rest in a slough. Deputy Hofer was not able to ascertain the speed of the vehicle, but he noted that there were no skid marks or evidence of braking. On the passenger's side of the vehicle, he found a .22 caliber rifle, which contained one spent cartridge. He found no alcoholic beverages in the vehicle or in the vicinity of the vehicle.

¶10 On March 11, 2003, Sheehan was cited with DUI, in violation of § 61-8-401, MCA (2003), to which he entered a plea of not guilty. In light of Sheehan's statements to Officer Arnson that he had been driving, and because his vehicle had been found just off Highway 16, the primary issue at trial was whether Sheehan had been "under the influence" of alcohol or drugs at the time he had been driving. Section 61-8-401(1)(a) and (3), MCA (2003).

¶11 On this issue, the defense, which did not call any witnesses, sought to establish that Sheehan's conduct on the night of February 20 was attributable to factors other than alcohol. Counsel elicited testimony from Nurse O'Connor that Sheehan could have gone into shock after shooting himself. She explained that "[i]f you've lost a lot of blood it can alter your consciousness" and that shock can also affect your mental reasoning. In addition, counsel

4

inquired during cross-examination of Deputy Hofer whether it appeared the driver of the vehicle had intentionally driven off the road, suggesting that Sheehan may have been suicidal or otherwise mentally impaired.

¶12    Pursuant to this effort, the defense also attempted to elicit testimony from Nurse O'Connor that Sheehan had received a psychiatric evaluation after leaving the hospital. Specifically, counsel cross-examined O'Connor as follows:

Q.    Do you know what happened to Mr. Sheehan after he left ICU?

A.    He was put out in a room on the floor.

Q.    Do you know what happened to him after he was released?

A.    From the hospital?

Q.    Right.

A.    No.

The State objected to this last question, leading to an argument in chambers. Although the transcript reflects that O'Connor answered "No" to defense counsel's question, this answer was apparently not noticed by counsel, the prosecutor, or the court.

¶13    In support of his objection, the prosecutor indicated that O'Connor's answer to defense counsel's question "is going to be that [Sheehan] went to a psychiatric facility" for examination after he was released from the hospital, which would "be suggestive of mental health problems." He argued that evidence of whether or not Sheehan suffered from a mental disease or defect was irrelevant since there is no mental state element in the charge

5

of driving while under the influence of alcohol, and that the jury could be confused or misled by the information.

¶14 In response, defense counsel conceded that state of mind is not an element of the crime and clarified that he was not pursuing the defense of mental disease or defect, but offered that "I don't see any harm by allowing me to question the witness. If she doesn't know what happened to Mr. Sheehan, then fine. I think it's an area that I can ask if she has, if she has an answer." On the question of relevance, defense counsel argued that evidence of Sheehan's having been sent to a psychiatric facility for evaluation was another possible explanation for his behavior on the night in question. In other words, Sheehan's behavior might have been attributable to symptoms or manifestations of a mental condition, not alcohol.

¶15 Following argument, the District Court sustained the State's objection; however, the court did not state the grounds for its decision. After proceedings resumed in open court, defense counsel stated that he had no further questions of Nurse O'Connor.

¶16 At the close of the State's case, Sheehan moved, pursuant to § 46-16-403, MCA, to dismiss the action "for the reasons that the State has failed to establish a prima facie case against Mr. Sheehan, and that they have failed to provide evidence that [he] was driving or in actual physical control of a vehicle while under the influence of alcohol." The court denied the motion, explaining that "[t]he jury is allowed to make inferences."

¶17 The jury rendered a guilty verdict. This appeal followed.

**STANDARD OF REVIEW**

¶18    Discretionary trial court rulings are ones which "encompass[] the power of choice among several courses of action, each of which is considered permissible," such as trial administration issues, evidentiary rulings, scope of cross-examination, and post-trial motions. *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 475, 803 P.2d 601, 603-04 (internal quotation marks omitted).  Our standard of review of such rulings in a criminal case is "abuse of discretion."  *State v. Beavers*, 1999 MT 260, ¶ 20, 296 Mont. 340, ¶ 20, 987 P.2d 371, ¶ 20.  *See also Porter v. Porter* (1970), 155 Mont. 451, 457, 473 P.2d 538, 541. The burden to demonstrate an abuse of discretion is on the party seeking reversal based on an unfavorable trial court ruling.  *See Henrichs v. Todd* (1990), 245 Mont. 286, 291, 800 P.2d 710, 713.

**DISCUSSION**

¶19    *Did the District Court err, and thereby violate due process, by denying defendant an opportunity to present an alternative scenario at trial to explain his apparent state of intoxication?*

¶20    Sheehan's claim on appeal is that he was denied a meaningful opportunity to present a complete defense at trial, in violation of his due process rights under Article II, Section 17 of the Montana Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.  His specific challenge, however, is directed solely to the District Court's ruling sustaining the State's objection to Nurse O'Connor's testimony.

¶21    It is necessary at the outset to clarify the scope of the challenged ruling.  Sheehan asserts that the District Court broadly "denied him the opportunity to present at trial an

7

alternative scenario to explain his apparent state of intoxication" and violated his due process rights. The State counters that Sheehan did not advise the District Court, through an offer of proof, of the results of his psychiatric examination, his specific mental illness, or of "any witness, let alone an expert witness, that would testify regarding the nature of his mental illness and that a mental illness was the cause of Sheehan's behavior along the highway and later at the hospital."

¶22 Sheehan responds that the prosecution itself advised the District Court, during the argument in chambers which followed the State's objection to defense counsel's question to Nurse O'Connor, that prior to the commencement of the criminal proceedings, involuntary mental commitment proceedings had been initiated against Sheehan, and that this was the kind of evidence the defense was seeking to introduce. Thus, Sheehan contends the District Court was aware of the theory it sought to develop.

¶23 However, though the District Court may have been aware of the general subject matter which the defense sought to explore, i.e., Sheehan's mental condition, it does not follow therefrom that the District Court was aware of the specific evidence Sheehan intended to offer in support of his defense theory of an "alternative scenario to explain his apparent state of intoxication." The defense did introduce other evidence, through witnesses O'Connor and Hofer, that would have supported other plausible explanations for Sheehan's behavior–specifically, the effects of going into shock and Sheehan's possible suicidal actions. It would not have been possible, however, from the arguments given following the objection, for the District Court to have gleaned the broader defense intentions which

8

Sheehan now argues were denied to him and ruled accordingly. Indeed, Sheehan's assertion on appeal that he was deprived of a meaningful opportunity to present a complete defense which violated due process was not raised before the District Court.

¶24 Based on the record and the briefs, it appears that Sheehan alerted the District Court, in response to the State's objection, of his intention to introduce nothing more than the fact that Sheehan was sent to Glendive for psychiatric examination. If his intention was actually to elicit further testimony from Nurse O'Connor or other witnesses relating the psychiatric examination or his mental condition to his behavior on February 20, 2003, he had an obligation to make the District Court aware of this testimony so that the court could properly rule on it. *See State v. Miller* (1988), 231 Mont. 497, 508, 757 P.2d 1275, 1282 ("An offer of proof should be specific as to the facts to be proven."). By failing to do so, the defense also failed to test against the District Court's ruling other evidence he may have wished to introduce concerning Sheehan's mental condition, and we therefore cannot construe the court's ruling as applying to anything more than O'Connor's answer to defense counsel's question.

¶25 Hence, the contested ruling of the District Court encompassed only Nurse O'Connor's specific testimony, as opposed to the entirety of Sheehan's "alternative scenario to explain his apparent state of intoxication." As previously explained, the court, the prosecutor, and defense counsel all assumed during arguments in chambers that this testimony was going to be that Sheehan went to Glendive for a psychiatric evaluation after he was released from the hospital. Unbeknownst to all parties, however, O'Connor had already answered defense

9

counsel's question, stating that she did not know what happened to Sheehan after he was released from the hospital.[1]  There is no reason to believe that she would have given a different answer had the court overruled–instead of sustained–the State's objection.

¶26    Thus, the District Court's ruling on the State's objection was moot.  Because a party cannot appeal from what amounts to an academic exercise, Sheehan's claim must be denied.

¶27    Affirmed.


                                        /S/ JIM RICE


We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS

---

[1]There has been no challenge to the accuracy of the transcript of the proceedings.