# IN THE MATTER OF G.M.,
## Respondent and Appellant.

No. DA 08-0229.
Submitted on Briefs January 14, 2009.
Decided February 25, 2009.
2009 MT 59.
349 Mont. 320.
203 P.3d 818.

For Appellant: **Thomas A. Dooling, Andree Larose**; Disability Rights of Montana, Helena.

For Appellee: **Hon. Steve Bullock**, Montana Attorney General; **Sheri K. Sprigg**, Assistant Attorney General, Helena; **Leo Gallagher**, Lewis & Clark County Attorney; **K. Paul Stahl**, Deputy County Attorney, Helena.

CHIEF JUSTICE MCGRATH delivered the Opinion of the Court.

¶1 G.M. appeals from an order of the District Court of the First Judicial District, Lewis and Clark County, involuntarily recommitting him to residential treatment at the Montana Developmental Center (MDC) in Boulder, Montana. We affirm.

## BACKGROUND

¶2 G.M. is a developmentally disabled man in his mid-thirties who has been committed and recommitted to MDC for about half of his life. Cases concerning these commitments have been before this Court in the past. *In the Matter of G.M.*, 261 Mont. 499, 862 P.2d 415 (1993); *In the Matter of G.M.*, 2008 MT 200, 344 Mont. 87, 186 P.3d 229. In both instances we reversed the District Court's decision to recommit G.M. to MDC.

¶3 Involuntary commitment of a seriously developmentally disabled person to a residential facility in Montana is governed by Title 53, Chapter 20, MCA. When a petition seeking commitment is filed, the district court must refer the petition to the Residential Facility Screening Team (RFST) of the Developmental Disabilities Division of the Department of Health and Human Services. Sections 53-20-125 and -133, MCA. The RFST makes a report to the court on its determination as to whether the individual is seriously developmentally disabled as defined in § 53-20-102(18), MCA:

(18) "Seriously developmentally disabled" means a person who:

(a) has a developmental disability;

(b) is impaired in cognitive functioning; and

(c) cannot be safely and effectively habilitated through voluntary use of community-based services because of behaviors that pose an imminent risk of serious harm to self or others.

The court may not consider commitment to a residential facility unless the RFST determines that the person is seriously developmentally disabled. Sections 53-20-125 and -133, MCA. *See In the Matter of T.W.*, 2005 MT 340, ¶ 5, 330 Mont. 84, 126 P.3d 491. The maximum period of commitment is one year. Section 53-20-126, MCA.

¶4 This appeal arises from the State's August, 2007, petition to recommit G.M. to MDC. The District Court continued his then current

commitment and referred the matter to the RFST as provided by law. Section 53-20-133, MCA. The RFST reported on August 17, 2007 that G.M. continued to be seriously developmentally disabled and recommended that he be recommitted to MDC.

¶5   G.M., through counsel, requested that he be evaluated at public expense by a professional of his choice. The District Court, after receiving briefs and a cost estimate of over $8,000 for the evaluation by G.M.'s chosen professional, granted the request for an evaluation, but limited the cost to be paid by the county to $1,160. That figure was based upon eight hours of evaluation at the expert's $145 hourly rate. G.M. represents in this appeal that he found funds from other sources to make up the difference between the expert's estimate and the amount allowed by the District Court, and that the evaluation was completed. The complete evaluation was placed into the record below and was referred to in the District Court's order of commitment.

¶6   G.M. also filed pre-hearing motions asking the court to construe the term "seriously developmentally disabled" as used in § 53-20-102(18), MCA, and requesting that the State be required to prove "physical facts or evidence" beyond a reasonable doubt and all other matters by clear and convincing evidence. The State filed a pre-hearing motion requesting that G.M. be barred from offering evidence of licensing infractions at MDC or evidence that MDC "does not properly evaluate or treat individuals." The District Court denied G.M.'s motions and granted the State's motion.

¶7   Thereafter, the hearing in the case was vacated at the request of the parties. No facts were presented to the District Court concerning G.M.'s recommitment except that the report of the RFST and the report of G.M.'s chosen professional[1] were placed into the record. G.M. and the State entered a stipulation that G.M. would be recommitted to MDC from August 2007 until August 2008. The parties also stipulated that if G.M. displayed no "aggressive or other harmful behaviors" for the next six weeks, he would be referred for placement in community-based services. The stipulation also recited that G.M. did not admit that he is "seriously developmentally disabled" or that he "otherwise meets the criteria for recommitment," but that given the District Court's prior orders on the cost of the expert evaluation and on the respective pre-hearing motions, "the District Court will have sufficient evidence upon

---

[1] The report by G.M.'s chosen professional concluded that G.M. has a developmental disability and has impaired cognitive functioning. The professional also concluded that G.M. did not pose an imminent risk of harm and should be placed in a community setting.

which to recommit the Respondent."

¶8 The District Court then entered findings of fact, conclusions of law and an order committing G.M. to MDC for one year. The present appeal followed.

## ISSUES ON APPEAL

¶9 G.M. raises the following issues on appeal, which we restate as follows:

1. Whether the District Court erred in applying the clear and convincing evidence standard of proof in commitment proceedings for persons with developmental disabilities.

2. Whether the District Court erred in limiting evidence concerning conditions and practices at MDC.

3. Whether the District Court erred interpreting the term "seriously developmentally disabled" with regard to the availability of community-based services.

4. Whether yearly recommitment requires this Court to fashion a remedy to produce some other outcome.

5. Whether the District Court erred in limiting the amount of public funds for payment of the evaluation professional chosen by G.M.

## STANDARD OF REVIEW

¶10 This Court reviews de novo a district court's legal conclusions, including interpretations of statutes, to determine whether they are correct. *In the Matter of E.P.B.*, 2007 MT 224, ¶ 5, 339 Mont. 107, 168 P.3d 662. The standard of review of a district court's grant or denial of fees and costs is whether the court abused its discretion. *Denton v. First Interstate Bank*, 2006 MT 193, ¶ 19, 333 Mont. 169, 142 P.3d 797.

¶11 We review discretionary trial court rulings, including trial administration issues and evidentiary rulings, for abuse of discretion. A district court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or in excess of the bounds of reason resulting in substantial injustice. *Pumphrey v. Empire Lath and Plaster*, 2006 MT 255, ¶ 9, 334 Mont. 102, 144 P.3d 813. In determining whether a trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court, but rather whether the trial court acted arbitrarily. *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, 134 P.3d 45. The burden to demonstrate an abuse of discretion is on the party seeking reversal of an unfavorable ruling. *State v. Sheehan*, 2005 MT 305, ¶18, 329 Mont. 417, 124 P.3d 1119.

### DISCUSSION

¶12 Issue 1. The first issue is whether the District Court erred in its prehearing order that the clear and convincing evidence standard of proof would apply to the case. Since there was no hearing and G.M. ultimately stipulated to recommitment, the standard was not actually applied to any evidence in this case. By stipulating to recommitment, G.M. necessarily conceded that there was sufficient clear and convincing evidence to recommit him.

¶13 ■ The established rule in Montana is that in commitment or recommitment proceedings involving persons with developmental disabilities, the State bears the burden of proving the grounds for commitment by clear and convincing evidence. *In the Matter of W.M.*, 252 Mont. 225, 229, 828 P.2d 378, 381 (1992). Adoption of this heightened standard of proof is required by the United States Constitution and is based upon the express recognition that civil commitment is a significant deprivation of liberty that requires significant due process protection. *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 1809 (1979). A standard of proof higher than clear and convincing evidence is not appropriate for commitment proceedings involving persons with developmental disabilities. *Heller v. Doe*, 509 U.S. 312, 320-28, 113 S. Ct. 2637, 2643-47 (1993).

¶14 The United States Supreme Court's decision in *Addington v. Texas*, relied upon by this Court in *Matter of W.M.* in setting the clear and convincing evidence standard of proof, analyzed the function of a standard of proof as it relates to due process and the reasons why different standards of proof are appropriate in differing settings.

> [A] civil commitment proceeding can in no sense be equated to a criminal prosecution. In addition, the "beyond a reasonable doubt" standard historically has been reserved for criminal cases. This unique standard of proof, not prescribed or defined in the Constitution, is regarded as a critical part of the "moral force of the criminal law," and we should hesitate to apply it too broadly or casually in noncriminal cases.

*Addington*, 441 U.S. at 428 (citations omitted). The Court emphasized that both the State and the individual have significant and legitimate interests in the commitment process that are protected by the clear and convincing evidence standard. *Addington*, 441 U.S. at 430.

¶15 Montana statutes governing the commitment of developmentally disabled persons contain no required standard of proof for commitment proceedings. The hearing is held before the district court without a jury, and the maximum period of involuntary commitment is one year. Sections 53-20-125(6) and -126, MCA. G.M. argues that proof of grounds

for commitment by clear and convincing evidence is not sufficient to protect the important individual rights to liberty, dignity, privacy, equal protection and due process guaranteed under the Montana Constitution. G.M. asserts that those rights can only be adequately protected by adoption and application of the statutory standard of proof found in the Montana statutes governing commitment of persons with serious mental illnesses. That statute provides, in pertinent part:

> The standard of proof in a hearing held pursuant to this section is proof beyond a reasonable doubt with respect to any physical facts or evidence and clear and convincing evidence as to all other matters. However, the respondent's mental disorder must be proved to a reasonable medical certainty.

Section 53-21-126(2), MCA. Even though G.M.'s arguments refer to this as a "bi-furcated" standard of proof, it more accurately contains three standards—beyond a reasonable doubt, clear and convincing, and to a reasonable medical certainty—to be applied depending upon the type of evidence.

¶16 This Court has addressed the application of this multi-level standard of proof in mental illness commitment proceedings. *In the Matter of the Mental Health of T.J.D.*, 2002 MT 24, ¶ 13, 308 Mont. 222, 41 P.3d 323. This Court explained that the evidentiary standard is "bifurcated":

> (1) with respect to physical facts or evidence, there must be proof beyond a reasonable doubt; and (2) as to all other matters, including the existence of a mental disorder, there must be clear and convincing evidence. Under this bifurcated standard, proof of mental disorders to a reasonable degree of medical certainty is sufficient if, considered with all the other evidence in the case, the trier is led to the conclusion that the mental disorder exists by clear and convincing proof.

*In the Matter of G.P.*, 246 Mont. 195, 197, 806 P.2d 3, 4-5 (1990) (citations omitted).

¶17 As a practical matter it is difficult to imagine how this standard of proof will in fact protect important constitutional rights here. If this Court were to adopt G.M.'s position and impose the mental illness standard from § 53-21-126(2), MCA, the most crucial issues in a commitment proceeding, including the existence of developmental disability and cognitive impairment, would still be determined by a clear and convincing evidence standard. All medical testimony would meet the reasonable degree of medical certainty standard. Only "physical facts" would be subject to proof beyond a reasonable doubt. Physical facts could include whether the person can follow directions,

or whether he can use the phone, or whether some particular incident happened. Since only factual issues would come under the beyond a reasonable doubt standard, adopting it would accomplish much less than G.M. asserts.

¶18 The proposed standard of proof would also make the process needlessly more complicated and confusing. The most important issues, including professional interpretation and application of the physical facts, prediction of future behavior, and proof of medical conditions, would still be considered under the standard of clear and convincing evidence or to a reasonable degree of medical certainty.

¶19 Clear and convincing evidence is not a mere preponderance of the evidence, but is evidence that is "definite, clear and convincing." *Matter of W.M.*, ¶ 23. Section 27-1-221(5), MCA, defines clear and convincing evidence as that "in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence. It is more than a preponderance of evidence but less than beyond a reasonable doubt." In Montana we require clear and convincing evidence for proof of a variety of important issues that also implicate individual constitutional rights. *See* § 40-9-102, MCA (determination of rights of grandparent-child contact); § 41-3-609(1), MCA (termination of parent-child relationship); § 42-2-417(1), MCA (proof that consent to adoption was obtained by fraud or duress); § 42-2-608(1)(h)(ii), MCA (grounds for termination of parental rights); § 46-14-301(3), MCA (proof that a person previously committed upon finding of not guilty by reason of lack of mental state may not be safely released); and § 53-24-302(4), MCA (involuntary commitment of alcoholics).

¶20 ▇ We find no legal or factual reason to conclude that application of the standard of proof advocated by G.M. would protect individual constitutional rights to any greater degree than the present clear and convincing evidence standard. The legislature has not chosen to apply the standard to developmental disability commitment proceedings, and it is not required as a matter of United States constitutional law. We therefore conclude that the District Court was correct to apply the clear and convincing standard of proof and that a proof of "physical facts" beyond a reasonable doubt is not required in developmental disabilities commitment proceedings.

¶21 Issue 2. The next issue is whether the District Court erred in limiting evidence concerning general conditions and practices at MDC, by granting the State's motion in limine. The State moved for an order precluding G.M. from introducing evidence of "licensing infractions received by MDC" and evidence that MDC "does not properly evaluate or treat individuals." G.M. resisted the motion, arguing that evidence

of any and all practices and conditions at MDC, whether or not they directly impacted or involved him, was relevant and admissible.

¶22 The District Court granted the State's motion, declining to receive "evidence pertinent to the practices, rules and policies of the Montana Developmental Center or other state facilities," explaining that receiving such evidence "would be time consuming and have no practical effect on the Court's determination of whether the Respondent needs to be committed." On appeal, G.M. argues that this order caused him to forego a hearing and stipulate to recommitment, having concluded that the District Court would refuse to consider any evidence except proof of his age and the contents of the RFST report.

¶23 G.M. expressly did not stipulate that he was seriously developmentally disabled or that he met the criteria for recommitment. Neither did he exercise his right to argue that he did not have a developmental disability or that he is not impaired in cognitive functioning.

¶24 Decisions regarding the relevance and admissibility of evidence are within the discretion of the district court. M. R. Evid. 401, 402. *Williams v. Union Fidelity Life*, 2005 MT 273, ¶ 39, 339 Mont. 158, 123 P.3d 213; *Lopez v. Josephson*, 2001 MT 133, ¶ 14, 305 Mont. 446, 30 P.3d 326. Here, the court below determined that evidence regarding general conditions at MDC that were not designed to address the specific question before the court, whether G.M. was seriously developmentally disabled as required by Montana statute, was irrelevant and, therefore, not admissible.

¶25 We are not persuaded by G.M.'s contention that the order made his recommitment a foregone conclusion and that he had no alternative except to stipulate to recommitment. G.M.'s chosen professional submitted an evaluation that was in excess of 50 pages, and there is nothing in the District Court's orders to indicate that the expert would not have been allowed to testify as to his opinions on G.M.'s condition and the care he needed. The District Court ordered the county to pay for part of the expert's fee and the report was placed in the court record. The fact that G.M. may have been foreclosed from presenting a broad attack on the conditions or practices at MDC that did not directly involve him did not make recommitment a "foregone conclusion." We conclude that the court's decision was not an abuse of discretion under the law and the facts presented below.

¶26 Issue 3. The next issue is whether the District Court erred in interpreting the term "seriously developmentally disabled" as it relates to the availability of community-based services. A court may involuntarily commit a developmentally disabled person who is

"seriously developmentally disabled." Section 53-20-125(1), MCA. A person is seriously developmentally disabled if he or she:

    (a) has a developmental disability;

    (b) is impaired in cognitive functioning; and

    (c) cannot be safely and effectively habilitated through voluntary use of community-based services because of behaviors that pose an imminent risk of serious harm to self or others.

Section 53-20-102(18), MCA.

¶27 The present issue arises from G.M.'s prehearing motion asking the District Court to hold that he would not meet the definition of seriously developmentally disabled if he could be safely and effectively habilitated through community services, whether or not those services were actually available to him. The District Court held, in the prehearing ruling, that while there is a preference in the statutes for community-based placement, there is no absolute right to such placement, citing *Matter of W. M.*, 252 Mont. at 229, 828 P.2d at 381 and *Matter of T.W.*, ¶ 30.

¶28 G.M. argued that if a community-based setting that would address his safe and effective habilitation could be described, then he was not seriously developmentally disabled under § 53-20-102(18)(c), MCA, whether or not such a setting was or ever has been actually available. He argued that if there was no community-based facility actually available that would accept him, he could not be committed to MDC.

¶29 G.M. waived his right to a hearing and provided no proof of any alternative placement that would protect his and the community's interests and welfare or as to availability of community-based services. Therefore, our review is limited by the absence of a factual record as to whether there were community-based services available to G.M. However, the parties stipulated in the District Court that G.M. could be placed in a community facility at any time during the commitment, presumably if a facility was made available.

¶30 ▌ The relevant statutes must clearly be read as the District Court read them to require that the community-based services referred to in § 53-20-102(18), MCA, must be services that are actually available for use. "Community-based facilities" are specifically defined as "those facilities and services that are *available* for the evaluation, treatment, and habilitation of persons with developmental disabilities in a community setting." Section 53-20-102(5), MCA (emphasis added). "Available" is also defined to mean

    (i) that services of an identified provider or providers have been found to be necessary and appropriate for the habilitation of a specific person by the person's individual treatment planning

team;

(ii) that funding for the services has been identified and committed for the person's immediate use; and

(iii) that all providers have offered the necessary services for the person's immediate use.

Section 53-20-102(1), MCA. Therefore as a matter of statutory construction, the District Court properly considered whether community-based services to safely and effectively habilitate G.M. were actually available.

¶31 G.M. additionally argues that his individual constitutional rights to liberty, privacy, dignity, equal protection and due process are all violated by requiring that community-based services be actually available. However, Montana law does not provide persons with serious developmental disabilities an absolute right to placement in community-based services. District courts may not order a person to be placed into community-based services, § 53-20-132, MCA, and this Court has upheld the constitutionality of that provision. *Matter of T.W.*, ¶ 17.

¶32 In 1988, the Montana Constitution, art. XII, § 3, was amended to provide that the legislature has discretionary authority to provide economic and rehabilitative services:

The legislature may provide such economic assistance and social and rehabilitative services for those who, by reason of age, infirmities, or misfortune are determined by the legislature to be in need.

Mont. Const. art. XII, § 3(3). The Constitution's specific grant of discretion as to whether to provide rehabilitative services and removal of the former mandatory duty to do so, preclude an argument that any failure to provide services is itself unconstitutional. "[N]either the Constitution nor the implementing laws require the [State] to extend community-based services, much less to do so in a timely manner. Any reviewing court would be compelled to acknowledge as much." *Matter of T.W.*, ¶ 36 (Cotter, J., concurring).

¶33 Issue 4. The next issue is whether yearly recommitment as provided by the statutes requires this Court to fashion a remedy to require some other outcome. G.M. argues that by the time each recommitment is contested, decided by the lower court, and appealed to this Court for review, another recommitment is in the works. Even if he gets a reversal from this Court as he did in 2008, he remains committed to MDC and he wants this Court to intervene.

¶34 G.M. requests this Court to exercise its "inherent authority" to prohibit the State from seeking to recommit him unless there are

"significantly changed factual circumstances" from those that resulted in the reversal of his last commitment. In light of G.M.'s stipulating to recommitment, the State has represented to this Court that it agrees not to seek recommitment of G.M. unless there are significantly changed circumstances. We therefore deem this issue settled.

¶35 Issue 5. The last issue is whether the District Court erred in limiting the amount of public funds available for payment of the evaluation professional chosen by G.M. In the proceedings below, G.M. moved pursuant to § 53-20-112(2)(d), MCA, for an order directing the county to pay for an evaluation of him "conducted by a professional of [his] choice." The State objected to the motion on the ground that no information had been presented to the District Court as to need or cost. G.M. responded that no such information had been provided because similar motions had been granted as a matter of "routine" in the past.

¶36 Both sides briefed the issue, and G.M. identified his chosen professional as Dr. Michael Butz, who submitted a cost estimate of approximately $8,000 for an evaluation, exclusive of charges for any testimony. After considering the briefing, the District Court granted G.M.'s motion to the extent of ordering that the county would be responsible for paying for eight hours of evaluation at a cost of $1,160. G.M. found other funds to make up the difference and was extensively evaluated by Dr. Butz, whose report was placed into the District Court record without objection by the State.

¶37 Section 53-20-112(2)(d), MCA, gives the parent or guardian of a person who is the subject of a commitment proceeding the right to have the person "examined by a professional of the parents' or guardian's choice when a professional is reasonably available unless the person chosen is objected to by the respondent or by a responsible person appointed by the court." This was the section that G.M. relied upon below to support the motion, but it is not applicable because the motion was not made by a parent or guardian but was made by and on behalf of G.M. himself.

¶38 The statute that actually applied to the situation was § 53-21-118, MCA, which is in the portion of the codes dealing with mental illness commitments, made applicable to developmental disabilities proceedings by § 53-20-112(1), MCA. Section 53-21-118(1), MCA, gives the respondent, his attorney or a friend appointed by the court the right to "secure a professional person of his own choice to examine the respondent and to testify at the hearing ...." Subsection (2) provides that if the person wishing to secure the professional testimony can not afford to pay for it, the court "[w]herever possible ... shall allow the respondent a reasonable choice of an available professional person qualified to

perform the requested examination who will be compensated from the public funds of the county where the respondent resides." Under this statute, this was a matter submitted to the sound discretion of the District Court which we will not disturb without a showing of abuse of discretion.

¶39 Here the District Court allowed the parties considerable latitude in presenting briefs and other materials including affidavits on this issue. Dr. Butz submitted an affidavit describing generally what he intended to do in his evaluation of G.M. along with his "conservative cost estimate" of $8,491, not including any court testimony. The State submitted materials from another case involving an examination by Dr. Butz in which the final public-expense bill was over $12,000, exceeding the pre-examination estimate by 50%. The State also argued that portions of the work Dr. Butz proposed to do covered items that were not at issue in the case. Further, G.M. had been evaluated extensively in 2006 by an expert of his choosing, Dr. Franczak, and the report of that evaluation was available.

¶40 The only real issue before the District Court was how much of Dr. Butz's proposed fee the county should be required to pay, because G.M. did not need the court's permission to call Dr. Butz as a witness. *See* § 53-21-115(2), MCA, made applicable to developmental disabilities proceedings by § 53-20-112(1), MCA. After considering these arguments and materials, the District Court ordered that only a portion (eight hours) of Dr. Butz's proposed charge be paid by the county. We note that in the context of mental illness commitments, there is a limit of eight hours on professional examinations of respondents. Section 53-21-123(1), MCA. While that is not one of the mental illness statutes specifically made applicable to developmental disabilities issues, it is instructive in evaluating the District Court's exercise of its discretion here.

¶41 In summary, we find that the District Court properly exercised its discretion.

¶42 For the reasons discussed above, the District Court is affirmed.

JUSTICES WARNER, RICE, COTTER and MORRIS concur.

JUSTICE LEAPHART concurring in part and dissenting in part.

¶43 I dissent to issue one. G.M. argues that the Court should adopt a "beyond a reasonable doubt" standard as to proof of physical facts. The Court addresses this issue and concludes that there is no basis for adopting such a standard in a developmental disabilities commitment proceeding.

¶44 However, as the Court notes (*Opinion*, ¶ 7), G.M. stipulated to a commitment and, as a result, there was no hearing and no "facts" were

presented to the District Court. I would conclude that since no "facts" were presented or at issue, a ruling on what is the appropriate standard of proof is nothing more than an advisory opinion. *Bair Family Trust*, 343 Mont. 138, ¶¶ 86-87, 183 P.3d 61. I would defer ruling on this issue until we are presented with a case in which physical facts are at issue and the parties can address whether a higher standard of proof would make a difference in the context of a given factual dispute.

¶45 I concur in the Court's resolution of issues two through five.

JUSTICE NELSON dissents.

¶46 I respectfully dissent from the Court's decision.

¶47 I join Justice Leaphart's dissent from the Court's decision on Issue 1, standard of proof.

¶48 Additionally, I dissent from the balance of the Court's Opinion. I agree with the various statutory and constitutional arguments made by G.M. in his briefs on appeal. I am not going to go further than that, however, because writing a lengthy dissent and analysis here on the constitutional questions raised would accomplish little given G.M.'s stipulation for recommitment. Presumably, these issues will be raised again in a future proceeding.

¶49 And, with respect to the stipulation, one can hardly fault G.M. for conceding his recommitment. He has already, after all, been slapped in the rear end so many times by the revolving door of Montana's recommitment process and the bureaucracy attendant thereto, *see In re G.M.*, 2008 MT 200, ¶ 3, 344 Mont. 87, 186 P.3d 229 (*G.M. I*), that he can be excused for figuring, "what's the use?" in the instant proceeding. I disagree with the Court's conclusion that G.M.'s recommitment was not a foregone conclusion. Opinion, ¶ 25. It was. *Infra*, ¶ 50. Indeed, I expect G.M. will again be up for recommitment by the time this Opinion is handed down.

¶50 Moreover, it is particularly troubling to me that the Court has upheld the trial court's denial of G.M.'s attempt to submit evidence concerning the general conditions and practices at MDC. I disagree that such general conditions and practices are effectively irrelevant. Indeed, from the numerous recommitment appeals in which I have participated, I am convinced that the general conditions and practices of MDC, along with the bureaucratic process of recommitment proceedings, *see G.M. I*, ¶¶ 33, 36, 40, 41, 45-47, and *In re T.P.*, 2008 MT 266, ¶¶ 6-8, 15-17, 345 Mont. 152, 190 P.3d 313, and the trial courts' general practice of treating these proceedings as a foregone conclusion, *see G.M. I*, ¶ 50, and *T.P.*, ¶¶ 9, 13, 18, are, fundamentally and inherently, a major part of the problem.

¶51 Unfortunately, this approach seems to mirror the State's prevailing view of people with developmental disabilities. In its brief on appeal, arguing that mentally ill persons and developmentally disabled individuals are not similarly situated, the State adopts secondary authority for the proposition that

> the cardinal difference is that mental retardation is not an illness. Mentally ill people encounter disturbances in their thought processes and emotions; mentally retarded people have limited abilities to learn. Many forms of mental illness are temporary, cyclical, or episodic. Mental retardation, by contrast, involves a mental impairment that is permanent. Thus, legal rules which focus upon the prospect of "curing" mentally ill people may not address the condition of retarded people in an appropriate or useful fashion. [Internal citations omitted.]

I refuse to embrace this crass and insensitive view that developmentally disabled people are essentially "broken and cannot be fixed."

¶52 Every day we encounter developmentally disabled people who go to school and colleges, who learn, who hold jobs, who earn wages, who live alone or with some assistance, who enjoy competitive sports, who have intimate relationships and who are productive members of society. *See e.g. Saucier ex rel. Mallory v. McDonald's Rest.*, 2008 MT 63, 342 Mont. 29, 179 P.3d 481 (a decision which, tragically, also demonstrates the darker side of how developmentally disabled people are exploited). Special Olympics is grounded in the idea that developmentally disabled people can enjoy competition and sports in the same fashion as those who are not so disabled. Perhaps mental retardation cannot be "cured" with our present state-of-the-art medicine, but there is no doubt that with proper, compassionate treatment and services, this condition can, at least, be ameliorated to the extent that developmentally disabled people–even those who exhibit dangerous behaviors–can enjoy a better quality of life.

¶53 Moreover, in endorsing the argument that developmentally disabled people are "incurable," the State might remember that it was not too many decades ago that mental illness was also viewed as a "permanent" condition. Mentally ill people were "treated" with involuntary frontal lobotomies and massive shock therapies, and were warehoused in insane asylums, often under deplorable conditions. Fortunately for those suffering from mental illness, medicine can now effectively treat most forms of this disease. We can trust that medicine will one day, likewise, find effective therapies for mental retardation and developmental illnesses as well.

¶54 In the meantime, however, the system must respect the fundamental rights of dignity, privacy, liberty, health, safety, happiness, equal protection and due process that all developmentally disabled people, as Montana citizens, enjoy. Developmentally disabled people must not be condemned by their government to a paternalistic system that starts from the premise that they are broken, "unfixable" and "incurable."

¶55 The Court's Opinion, however, does lead me to conclude that individual recommitment proceedings and appeals therefrom are not the appropriate forums in which developmentally disabled people might, in the future, challenge the general practices and conditions of MDC and vindicate their fundamental constitutional rights. Rather, it appears that these citizens' remaining remedies now will be a class action or action for declaratory judgment challenging not only the general practices and conditions of MDC, but, as well, this State's systemic failure to uphold the fundamental constitutional rights of developmentally disabled people and the Legislature's failure to enact a statutory scheme that requires appropriate treatment and funded services and community programs. *See T.P.*, ¶¶ 21-23 (Nelson, J., concurring), ¶¶ 25-31 (Gray, C.J., concurring). I look forward to that case.

¶56 Respectfully, I dissent.