DA 07-0756

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 83

IN THE MATTER OF L.S.,

     Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis & Clark, Cause No. CDI 2006-73
Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Andrée Larose, Thomas A. Dooling; Disability Rights Montana,
Helena, Montana

     For Appellee:

          Hon. Steve Bullock, Montana Attorney General;
Sheri K. Sprigg, Assistant Attorney General, Helena, Montana

          Leo Gallagher, Lewis and Clark County Attorney;
K. Paul Stahl, Deputy County Attorney, Helena, Montana

Submitted on Briefs:  January 14, 2009

Decided:  March 17, 2009

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    L.S. appeals from the September 13, 2007 order of the District Court of the First Judicial District, Lewis & Clark County, involuntarily committing him to residential treatment at the Montana Developmental Center (MDC) in Boulder, Montana. We affirm.

BACKGROUND

¶2    Involuntary commitment of a seriously developmentally disabled person to a residential facility in Montana is governed by Title 53, Chapter 20, MCA. The district court must refer each petition seeking commitment to the Residential Facility Screening Team (RFST) of the Developmental Disabilities Division of the Department of Health and Human Services. Sections 53-20-125 and -133, MCA. The RFST reports to the court its determination of whether the individual is seriously developmentally disabled as defined in § 53-20-102(15), MCA (2005):

> "Seriously developmentally disabled" means a person who:
> (a) has a developmental disability;
> (b) is impaired in cognitive functioning; and
> (c) cannot be safely and effectively habilitated in community-based services because of:
> (i) behaviors that pose an imminent risk of serious harm to self or others; or
> (ii) self-help deficits so severe as to require total care.

(The proceedings in District Court took place under the 2005 version of the Montana Code. Where there are differences between the 2005 and 2007 Codes, the 2005 Code will be cited and referenced.) The court may not commit a person to a residential facility unless the RFST first determines that the person is seriously developmentally disabled. Sections 53-20-125 and -133, MCA. *See In the Matter of T.W.*, 2005 MT 340, ¶ 5, 330 Mont. 84, 126 P.3d 491.

2

The maximum period of commitment is one year. Section 53-20-126, MCA.

¶3 In August, 2005, L.S. was discharged from a commitment at MDC and was placed in a community-based group home in Helena. Over the next year L.S. was involved in multiple incidents of physical altercations with staff members and others, and with some attempts to harm himself. The record below shows that he attacked or fought with staff members and others by punching, head butting, scratching, hair pulling, throwing objects and biting. He scratched himself with a piece of broken glass, banged his head against cupboards, and hit a glass door with his fist. These incidents would end when he was physically subdued and restrained by multiple staff members. Staff members called the police for assistance twice. The Farm in the Dell and West Mont Work Services terminated L.S. from work assignments at their facilities because of his physical aggression, the danger he posed to others, and destruction of property. West Mont reported that L.S. was a "significant risk to staff and clients" because he angered quickly and his level of aggression escalated rapidly. They expressed concern that the presence of L.S. compromised "the safety of staff and clients."

¶4 In December, 2006, L.S. became aggressive at the group home and started fighting with staff members. He head butted a staff member causing a bloody nose and abrasion, and fought with others by attempting to grab, hit, kick and bite them. He began to bang his own head against the floor, and staff put pillows under his head to try to avoid self injury. The group home staff members still could not control L.S. and called the police for help. When the police arrived L.S. continued to be combative, fighting with officers and biting one officer badly enough to draw blood.

¶5 L.S. was arrested and charged with felony assault on a peace officer, and was jailed

for several days. The State petitioned the District Court for an emergency commitment and the criminal charges were dismissed when he was committed to MDC on an emergency basis. The State then petitioned for involuntary commitment to MDC, and the District Court referred the case to the RFST as required by statute. In January, 2007, the RFST reported and recommended to the court that L.S. was seriously developmentally disabled and should be committed to MDC for up to one year.

¶6 The District Court held a hearing on the commitment petition in April, 2007. The State presented the testimony of Leslie Howe, who was the chair of the RFST; Connie Orr, a psychology specialist who worked with L.S. at MDC; and Deborah Gabse, a Qualified Mental Retardation Professional at MDC who also worked with L.S. L.S. presented the testimony of Dr. Michael Butz, a psychologist who evaluated him for purposes of the commitment proceeding.

¶7 There was little disagreement among the witnesses on most issues. L.S. did not present any evidence to contest the facts of the events that occurred while he was at the West Mont group home. Under § 53-20-129, MCA, an emergency commitment is allowed if necessary to protect the person or others from death or serious bodily injury, and all the witnesses agreed that the emergency commitment to MDC had been necessary. The witnesses all agreed that L.S.'s behavior had materially improved in the several months he had been in a secure ward at MDC and that the preferred placement for him would be in a community-based facility.

¶8 The witnesses all agreed that placing L.S. in a community-based facility again would be difficult because of his challenging behavior. First, a facility would have to be found that

4

would be willing to take L.S. That facility would have to be willing to provide adequate numbers of staff to undergo specialized training necessary to implement an individualized program to successfully habilitate L.S. There was testimony from State witnesses that there should be a gradual transition from MDC to a group home, involving gradual familiarization of L.S. with the staff members who would work with him there.

¶9 Dr. Butz thought that developing such an adequate individualized community program for L.S. would take several months, while Gabse believed that it would take at least six months and perhaps a year. None of the witnesses knew of any existing community-based facility that would be appropriate to L.S.'s needs without the preparation and training needed to implement his individualized program. The witnesses agreed that community placement would likely not be successful without implementation of such a plan.

¶10 The most significant disagreement among the witnesses was on the issue of whether L.S. should be committed to MDC after the emergency commitment. The witnesses agreed that L.S. was developmentally disabled and had impaired cognitive functioning, for purposes of § 53-20-102(15), MCA (2005). The witnesses disagreed as to whether L.S. was an imminent threat of harm to himself or others. The State witnesses testified that in their opinion L.S. would be an imminent danger to himself or others if he were returned to community placement prior to implementation of a specialized individual habilitation plan, based upon the physical incidents while he was at the West Mont group home. The State witnesses testified that if L.S. were in a community placement without a specially developed individualized program, he would again engage in the prior behaviors that represented a danger to self and others, and that all agreed had warranted an emergency commitment. Dr.

5

Butz testified that the conflicts during the community placement occurred only because of poor staff work by West Mont and that the staff did not understand L.S. sufficiently to divert him from violent episodes before they began. Dr. Butz also testified that in his understanding, whether a person is an "imminent" threat can be evaluated only in terms of what has happened in the last few hours, and that consideration of any other events is too remote.

¶11 Witnesses who testified for the State also hoped that L.S. could be placed in a community setting, but that there were no available facilities providing the services that he needed. They testified that if a community service provider were found who was willing to take L.S., it would take at least six months to develop an appropriate program for him, including a period of familiarization among the staff and L.S. prior to placement. All of this could only be started after locating a facility willing to participate.

¶12 After the hearing, the parties filed briefs and findings and the District Court issued Findings of Fact, Conclusions of Law and an Order on September 13, 2007. The District Court concluded, in accordance with the undisputed testimony, that L.S. had a developmental disability and impaired cognitive functioning, and that the issue was whether his behavior presents an imminent risk of serious harm to self or others so that he cannot be safely and effectively habilitated in community-based services. The court concluded that without an adequate community-based facility to serve him, he posed an imminent risk of harm to self or others. The court committed L.S. to the MDC "for a period of one year from April 17, 2007, or until such time as a suitable placement in a community-based facility is available." The court ordered MDC to place L.S. "on the referral" list for community

6

placement. L.S. appeals the order of commitment. Appellant's brief was filed in this Court on April 8, 2008, and briefing was not completed until June 30, 2008.

## ISSUES ON APPEAL

¶13   L.S. raises several issues on appeal that we restate as follows:

¶14   Whether the District Court erred in finding that L.S. posed an imminent risk of harm to himself or others and was therefore seriously developmentally disabled as defined in § 53-20-102(15), MCA (2005).

¶15   Whether the District Court's decision that L.S. was seriously developmentally disabled violates his constitutional rights.

¶16   Whether the District Court properly considered whether committing L.S. was in his best interests under § 53-20-125(10), MCA (2005).

¶17   Whether the District Court applied the proper standard of proof.

## STANDARD OF REVIEW

¶18   This Court reviews de novo a district court's legal conclusions, including interpretations of statutes, to determine whether they are correct. *In the Matter of E.P.B.*, 2007 MT 224, ¶ 5, 339 Mont. 107, 168 P.3d 662. We review discretionary trial court rulings, including trial administration issues and evidentiary rulings, for abuse of discretion. A district court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or in excess of the bounds of reason resulting in substantial injustice. *Pumphrey v. Empire Lath and Plaster*, 2006 MT 255, ¶ 9, 334 Mont. 102, 144 P.3d 813. In determining whether a trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court, but rather whether the trial court

7

acted arbitrarily without the employment of conscientious judgment or exceeded the bounds of reason, resulting in substantial injustice. The burden to demonstrate an abuse of discretion is on the party seeking reversal of an unfavorable ruling. *State v. Sheehan*, 2005 MT 305, ¶18, 329 Mont. 417, 124 P.3d 1119.

## DISCUSSION

¶19 *Whether the District Court erred in finding that L.S. posed an imminent risk of harm to himself or others and was therefore seriously developmentally disabled as defined in § 53-20-102(15), MCA (2005).* A person is not subject to involuntary commitment unless he is seriously developmentally disabled, § 53-20-125(1), MCA. In the proceedings below, L.S. did not contest that he met the first two prongs of § 53-20-102(15), MCA (2005), in that he has a developmental disability and impaired cognitive functioning. He contests the District Court's conclusion on the third prong, which requires a finding that he cannot be safely habilitated in a community-based facility because of behaviors that pose an imminent risk of serious harm to self or others. Under the testimony developed at the hearing below, the only factual issue was whether L.S.'s behavior posed an imminent risk of harm to self or others.

¶20 At the time of the hearing in District Court, and after four months of residence at MDC, L.S.'s behavior had improved and he was not exhibiting the combative behaviors that he had over the prior year in the community-based group home. The District Court found that this improvement was due to the fact that L.S. was no longer in a community-based setting but was in the more structured and secure setting of MDC. The court found that L.S. posed an imminent risk of harm to self or others when the emergency commitment was made in January, 2007, several months prior to the hearing, and that his prior conduct indicated

8

that he would pose an imminent risk of harm if returned to available facilities in the community.

¶21 L.S. contests reliance upon "remote" past behaviors as evidence of whether he poses an imminent risk to self or others, and contests the use of his past behaviors to predict his future behavior. The statute, § 53-20-102(15), MCA (2005), requires the district courts to predict, based upon the evidence presented at the hearing, whether the respondent poses an imminent risk of harm to self or others. Evidence of behaviors and events prior to the day of the hearing are logically and reasonably part of that determination. "Previous instances of violent behavior are an important indicator of future, violent tendencies." *Heller v. Doe*, 509 U.S. 312, 323, 113 S. Ct. 2637, 2644 (1993). Whether a person poses an imminent threat "must be proven by overt acts or omissions, sufficiently recent in time as to be material and relevant to the respondent's present condition." *In the Matter of the Mental Health of T.J.D.*, 2002 MT 24, ¶ 13, 308 Mont. 222, 41 P.3d 323 (construing "imminent" in the context of a mental illness commitment).

¶22 While Dr. Butz testified that L.S., in his opinion, was not an imminent threat because he had improved at MDC and was calm the day of the hearing, such a view of imminence does little to serve the needs and protect the rights of L.S. or the persons he might contact in the community. That opinion was also at odds with Dr. Butz's own testimony and the testimony of State witnesses that L.S. could be successfully placed in a community setting only with a highly structured individual program implemented by specifically-trained staff members.

¶23 The overwhelming evidence at the hearing established that L.S.'s behavior was a

threat of harm to himself or others during the time that he was in community placement, and that the threat required an emergency admission to MDC. The evidence established that the improvement in L.S.'s behavior after the emergency commitment was a result of the close supervision and structure provided by MDC. The evidence established that while community placement for L.S. was the preferred alternative, it would not be successful without prior development and implementation of an individual treatment plan. Other than Dr. Butz's construction of the word "imminent," virtually all the evidence showed that sending L.S. out to community placement again without a significant period of preparation would have the same result that it had before the emergency commitment.

¶24 The facts relied upon by the District Court to conclude that L.S. would be an imminent threat of harm to self or others were uncontested. They pertained to a time frame spanning only a few months which, under the circumstances, was sufficiently recent. We therefore conclude based upon this evidence that the District Court's determinations in the proceedings below were not clearly erroneous and that its conclusions of law were correct.

¶25 L.S. also argues that the District Court improperly considered the availability of community-based services in determining whether he was seriously developmentally disabled under § 53-20-102(15), MCA (2005). L.S. contends that it was not his behavior, but the "State's refusal to provide adequate community based services" that led the District Court to order his commitment. There is no evidence in the record to support this contention, and it is clear that the District Court was concerned about the evidence of L.S.'s behavior during the prior community placement. Consideration of that behavior played a pivotal role in the District Court's commitment decision.

10

¶26 The evidence showed that the State provided community-based services to L.S. at the West Mont group home during the year and a half prior to the emergency commitment. The State's witnesses supported returning L.S. to community placement, and testified that they would work to make it happen. The District Court's order recognized the goal of community placement for L.S. by committing him to MDC for one year "or until such time as a suitable placement in a community-based facility is available."

¶27 We recently construed the issue of availability of community-based facilities in this context. *In the Matter of G.M.*, 2008 MT 59, ¶ 30, ___ Mont. ___, ___ P.3d ___. In that case we concluded that the commitment statutes require that the community-based services be actually available for use. Here the evidence shows that such a facility was not available and we therefore affirm the District Court's holding.

¶28 *Whether the District Court's decision that L.S. was seriously developmentally disabled violates his constitutional rights.* L.S.'s argument that his constitutional rights were violated rests upon his prior arguments that he was wrongly committed, that the commitment resulted solely from the State's decision to not make community-based facilities available to him and that the commitment was "without justification." L.S. was afforded full procedural due process during the commitment proceeding and does not contend otherwise. L.S. did not have an absolute right to community placement, as we recently reiterated. *Matter of G.M.*, ¶ 30; *In the Matter of T.W.*, ¶ 36 (Cotter, J., concurring). L.S. has not made any substantial showing that he was committed wrongfully or without justification and therefore his argument that his constitutional rights were infringed must fail.

¶29 It is well established that states have the authority to involuntarily commit those who

11

pose a danger to themselves or others, and that both the state and the respondent have legitimate interests to be served by civil commitments. *Addington v. Texas*, 441 U.S. 418, 426, 99 S. Ct. 1804, 1809 (1979). This Court has upheld the constitutionality of the civil commitment of seriously developmentally disabled individuals, noting that under the Montana Constitution, art. XII, §3(3), the State is not required to provide or extend community-based services. *Matter of T.W.*, ¶¶ 18, 36. *See also In the Matter of W.M.*, 252 Mont. 225, 230, 828 P.2d 378, 381 (1992) (there are no federal or Montana constitutional rights to community-based treatment in lieu of residential commitment). We find no error in this issue.

¶30 *Whether the District Court properly considered whether committing L.S. was in his best interests*. Section 53-20-125(10), MCA (2005) provided that:

> The court may refuse to authorize commitment of a respondent to a residential facility for an extended period of treatment and habilitation if commitment is not in the best interests of the respondent.

L.S. contends that the District Court should have exercised its discretion under this statute to refuse to commit him to MDC. He contends on appeal that commitment could result in "a detriment" to him if he perceives that the failure of the community placement had been his fault. However, according to the testimony, immediate re-placement into the community without implementation of an individual habilitation plan would not be successful. A placement that was destined to fail again, with further negative impact on L.S. was clearly not in his best interests. The District Court's findings show a clear understanding of the evidence and of the situation facing L.S.

¶31 Section 53-20-125(10), MCA (2005), is essentially a safety valve that allows the

12

district courts to exercise discretion to override the statutory criteria for involuntary commitment when it is appropriate to do so. L.S. has made no showing that his individual situation warrants exercise of this discretion. The District Court commitment order here fully considered L.S.'s situation, his needs, and his future placement. We find no abuse of discretion in failing to override the evidence and to refuse commitment.

¶32 *Whether the District Court applied the proper standard of proof.* The District Court did not make any express order regarding the standard of proof. L.S. raised the issue in a motion to amend the judgment, which was denied. The established rule in Montana is that grounds for involuntary commitment of persons with serious developmental disabilities be proof by clear and convincing evidence. *Matter of W.M.*, 252 Mont. at 229, 828 P.2d at 381. We reaffirmed the use of that standard in *Matter of G.M.*, ¶ 20. We therefore dispose of this issue here in accordance with our previous holding.

¶33 For the reasons stated above, we affirm.


/S/ MIKE McGRATH

We concur:

/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ JIM RICE
/S/ BRIAN MORRIS


Justice James C. Nelson dissents.

¶34 I respectfully dissent from the Court's decision.

13

¶35    The State presented no evidence that L.S. posed an "imminent risk of serious harm to self or others" as is the State's burden under § 53-20-102(15), MCA (2005). At the time of the hearing and for four months prior thereto, L.S. did not exhibit any behaviors that posed an imminent risk of serious harm. The RFST's determination that L.S. was seriously developmentally disabled and its recommendation for commitment was limited to the facts as they existed at the time of L.S.'s emergency admission in December 2006—not as they existed at the date of the hearing. Indeed, at the hearing in April 2007, the RFST chairperson testified that L.S.'s behaviors had improved. However, whether L.S. posed an imminent risk was not based on this testimony of improved behaviors; rather, it was based on conduct occurring months earlier. On this undisputed evidence, there is not even a preponderance of evidence, much less clear and convincing proof, that L.S. exhibits behaviors that pose an imminent risk of serious harm to self or others.

¶36    Notwithstanding, in this case, the Court takes the position that the existence of past behaviors and speculation about future behaviors is a legally sufficient basis to prove *imminent risk*. However, that is not what the plain language of the statute or our caselaw requires. Our caselaw clearly holds that an "imminent risk" must be "fairly immediate," *Matter of F.B.*, 189 Mont. 229, 233-34, 615 P.2d 867, 869-70 (1980); evidenced by overt acts sufficiently recent in time as to be material and relevant to the person's present condition and the danger must be fairly immediate, *In re Mental Health of C.R.C.*, 2004 MT 389, ¶ 22, 325 Mont. 133, 104 P.3d 1065, and that there is a present indication of probable physical injury likely to occur at any moment or in the immediate future, *In re Mental Health of E.M.*, 265 Mont. 211, 213, 875 P.2d 355, 356-57 (1994). "*Imminent* means 'certain and very near,

14

impending[.]' . . . *Imminent* does not mean merely 'probable.' " Bryan A. Garner, *A Dictionary of Modern Legal Usage* 419 (2d ed., Oxford University Press 1995). An "imminent danger" is "[a]n immediate, real threat to one's safety that justifies the use of force in self-defense." *Blacks Law Dictionary* 421 (Bryan A. Garner ed., 8th ed., West 2004).

¶37 The Court's decision here that an "imminent risk" can be based on conduct occurring months before and not on present conduct, Opinion, ¶¶ 23-24, eviscerates the plain and unambiguous language of § 53-20-102(15), MCA (2005). Under this statute, when an individual does *not* exhibit behaviors that pose an imminent risk, then he cannot be determined to be seriously developmentally disabled.

¶38 L.S.—and others subject to recommitment—cannot win. So long as the person does not exhibit behaviors that pose an imminent risk of serious harm while at MDC, the lack of behaviors will be attributable to his environment and the District Court will find that he or she meets the criterion of having behaviors that pose an imminent risk of serious harm. On the other hand, should the person actually display assaultive or self-injurious behaviors with the potential to cause serious harm, the District Court will conclude he meets the criterion of having behaviors that pose an imminent risk of serious harm.

¶39 This case is simply another example of the problems involving developmental disability recommitments about which I wrote in *In the Matter of G.M.*, 2009 MT 59, ¶¶ 46-56, ___ Mont. ___, ___ P.3d ___ (Nelson, J., dissenting). These proceedings are foregone conclusions. Indeed, this Court now ignores the plain and unambiguous language of the

definition of developmental disability, § 53-20-101(15), MCA (2005), just to keep the revolving door spinning.

¶40    I respectfully dissent.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter joins in the Dissent of Justice James C. Nelson.

/S/ PATRICIA COTTER