FILED

01/04/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0301

DA 20-0301

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2022 MT 2

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

WILLIAM G. ROSSBACH,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DC-19-144
Honorable James A. Manley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Appellate Defender, Moses Okeyo, Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, C. Mark Fowler, Assistant Attorney General, Helena, Montana

            Steven Eschenbacher, Lake County Attorney, Polson, Montana

                 Submitted on Briefs:  September 22, 2021

                          Decided:  January 4, 2022

Filed:

_____
                Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 William George Rossbach was arrested and charged with assault on a peace officer in violation of § 45-5-201(a), MCA, after an altercation with Officer T.J. Haynes in May 2019. The District Court declared a mistrial in Rossbach's first trial after the jury failed to reach a verdict. At his second trial, a Lake County jury found him guilty. Rossbach appeals, challenging the District Court's denial of his motions to reschedule the second trial and to allow a jailed defense witness to wear street clothing during his testimony. Rossbach also appeals his persistent felony offender sentence. We affirm the conviction and the sentence.

¶2 We consider the following restated issues on appeal.

1. *Whether the District Court abused its discretion when it denied Rossbach's motion for continuance after setting the trial during his counsel's pre-planned vacation.*

2. *Whether the District Court abused its discretion when it denied Rossbach's motion to allow his witness to testify in civilian clothing rather than shackled and in jail clothing.*

3. *Whether the District Court illegally sentenced Rossbach as a persistent felony offender under § 46-1-202(18)(b)(ii), MCA, based on his release from a sentence on revocation when his most recent felony conviction was in 2001.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 On May 15, 2019, Officer Haynes saw Rossbach riding a bike that matched the description of one that had been reported stolen and tried to stop him. Rossbach did not stop for Officer Haynes, and Officer Haynes ran after him. The two ended up in a physical altercation when Rossbach would not comply with Officer Haynes's orders, and these charges resulted.

2

¶4     The Office of the Public Defender (OPD) appointed Liam Gallagher and Dianne Rice to represent Rossbach. The State filed notice that it would seek persistent felony offender (PFO) status.

¶5     The case went to trial in early December 2019, and a Lake County Jury found Rossbach guilty of resisting arrest but could not reach a verdict on the assault charge. Judge Manley declared a mistrial and scheduled a new trial date for December 16, 2019. On December 9, 2019, Rossbach filed a late notice, naming 20 new witnesses. The District Court held a hearing regarding the new witnesses two days later, and Rossbach moved for a continuance after it became clear that the court was not inclined to allow the late-noticed witnesses. The District Court granted the continuance, setting the trial date for February 3, 2020.

¶6     After the District Court set the new trial date, Rossbach filed a second unopposed motion to continue the trial because both of his attorneys had a previously planned, pre-paid vacation to Morocco. The District Court denied the motion; Gallagher and Rice withdrew from the case, and OPD appointed Alisha Backus to represent Rossbach.

¶7     At the second trial, Rossbach called Matthew Friedlander as a witness. Friedlander, like Rossbach, had a previous relationship with Officer Haynes's wife. Both Friedlander and Rossbach had been arrested by Officer Haynes, and they both alleged that Officer Haynes had used excessive force against them. At the time of the second trial, Friedlander was incarcerated on charges unrelated to this case or to his incidents with Officer Haynes. In anticipation of trial, Backus arranged for Friedlander to have civilian clothes to wear while testifying. When she brought the clothing to the jail the morning of

3

trial, the jail staff told her that because Friedlander was a violent offender and had threatened to escape, court security required him to wear his orange jail jumpsuit, shackles, and handcuffs while testifying. When court convened, Backus requested that the District Court allow Friedlander to wear civilian clothes. After hearing from both parties, the court refused the request based on the determination of court security.

¶8 Following a two-day trial, a Lake County Jury found Rossbach guilty of Assault on a Peace Officer. The District Court designated Rossbach a PFO and sentenced him to the Montana State Prison for fourteen years, with none suspended.

## STANDARDS OF REVIEW

¶9 We review matters of trial administration for abuse of discretion. *Estate of Frazier v. Miller*, 2021 MT 85, ¶ 12, 404 Mont. 1, 484 P.3d 912 (citation omitted). We review criminal sentences for legality. *State v. Gallagher*, 2005 MT 336, ¶ 16, 330 Mont. 65, 125 P.3d 1141 (citation omitted).

## DISCUSSION

¶10 *1. Whether the District Court abused its discretion when it denied Rossbach's motion for continuance after setting the trial during his counsel's pre-planned vacation.*

¶11 Rossbach contends that the District Court abused its discretion by denying his motion for a continuance because a vacation is a "valid basis for granting a continuance." He asserts that he was prejudiced by the court's denial because he lost his lawyers and subsequently was convicted of assault on a peace officer by a unanimous jury. The District Court, he argues, improperly gave his interest in having the same lawyers defend him in the second trial less import than it gave to speedy trial concerns and crowded

4

dockets. He alleges that the denial violated his right to a fair trial because his replacement counsel did not have the experience of trying his case in the first trial, at which Rice and Gallagher had nearly secured his acquittal.

¶12 Ruling on a motion to continue a trial "is left to the discretion of the trial court." *State v. Molder*, 2007 MT 41, ¶ 23, 336 Mont. 91, 152 P.3d 722. "This Court will not overturn a district court's decision to deny a continuance 'unless the district court abused its discretion and the ruling prejudices the defendant.'" *State v. Duncan*, 2008 MT 148, ¶ 37, 343 Mont. 220, 183 P.3d 111 (quoting *State v. Ibarra-Salas*, 2007 MT 173, ¶ 13, 338 Mont. 191, 164 P.3d 898). "A district court abuses its discretion if it acts arbitrarily without conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *State v. Kaarma*, 2017 MT 24, ¶ 6, 386 Mont. 243, 390 P.3d 609 (citation and quotation omitted).

¶13 A district court may grant a continuance "if the interests of justice so require." Section 46-13-202(2), MCA. When reviewing a district court's denial of a motion for a continuance, we consider factors such as:

> the length of the requested delay, whether there was a showing that the State's case would be prejudiced, the reasons for the requested continuance, whether defense counsel was diligent in preparation for trial, whether the defendant's right to a speedy trial would be violated, and the defendant's right to effective assistance of counsel.

*Molder*, ¶ 23 (citing *State v. Sotelo*, 209 Mont. 86, 91, 679 P.2d 779, 782 (1984)).

¶14 In denying Rossbach's motion, the District Court weighed the competing interests at play. It explained that a continuance would lead to an additional thirty-one days of incarceration for Rossbach, on top of the forty-nine days of delay caused by the mistrial

and first continuance. The court observed that the first continuance was caused by Gallagher's untimely notice of witnesses and failure to make a showing of good cause to the court why it should consider his request. Further, the court explained that on Rossbach's "ideal" date for the trial, five felony trials were scheduled, and if any one of those cases went to trial, Rossbach could face additional delays. The District Court expressed concern whether Rossbach "was consulted or consented to these additional delays while he remain[ed] incarcerated." Defense counsel did not file a written speedy trial waiver signed by Rossbach. Finally, the court considered the State's prejudice, concluding that the cost of a continuance would be between $2,550 and $5,100. On balance, the court determined that Rossbach's counsel's pre-planned vacation was a "minimal" justification given the prejudice such a delay would cause.

¶15 Public defenders and prosecutors are without doubt entitled to responsibly scheduled vacations. But the District Court did not refuse the requested continuance on this basis alone. It discussed each of the considerations we noted in *Molder*, including Rossbach's right to a speedy trial, the defense's diligence in preparing for trial, and prejudice to the State. The court concluded that the additional delay because of Gallagher and Rice's travel plans was not a sufficient justification to continue the trial for a second time when new counsel was available.

¶16 Rossbach has been unable to demonstrate how the court's denial prejudiced him. Although his counsel for the second trial, Backus, had only 46 days to take the case to trial, his previous counsel, Gallagher and Rice, had only 44—and Backus had the benefit of their work. Rossbach has not shown or argued that he received ineffective assistance of trial

6

counsel but only speculates that because the first jury deadlocked, he should have fared at least as well in the second trial. The District Court, though, praised Backus for her thorough trial preparation. Rossbach's theory that he may have had "a better chance of acquittal" had the same counsel tried his case a second time is not enough to show prejudice. *See State v. Hocevar*, 2000 MT 157, ¶ 63, 300 Mont. 167, 7 P.2d 329. Rossbach has not established that the District Court abused its discretion in refusing the continuance.

¶17    2. *Whether the District Court abused its discretion when it denied Rossbach's motion to allow his witness to testify in civilian clothing rather than shackled and in jail clothing.*

¶18    Rossbach argues he was prejudiced by the District Court's denial of his motion to allow his witness, Friedlander, to testify in civilian clothes. Rossbach analogizes a witness's right to be dressed in civilian clothes with that of a defendant's and draws upon case law from other jurisdictions that have held the same. Rossbach contends that Friedlander's appearance in his orange jumpsuit, shackles, and handcuffs "obliterated" Friedlander's credibility before the jury, prejudicing Rossbach and undermining his right to a fair trial.

¶19    The State responds that the District Court properly considered the security concern Friedlander presented when it denied Rossbach's request. As the prosecutor explained, Friedlander "has a violent history. He threatened to try to escape." The court acknowledged these concerns in its ruling:

> THE COURT: And here is the problem I have, Alisha, is that Mr. Gallagher noticed this witness about two months ago as a new witness. And so the defense has had two months to ask for a hearing to determine—for the Court to determine his level of risk. To do that with the jury waiting outside for the first time is not acceptable and I'm not going to stop—I'm not going to hold

7

all these jurors outside while we have a hearing to determine Mr. Friedlander's level of risk. And for that reason I'm leaving it up to the court security.

Furthermore, I don't think there is going to be much, if any, prejudice to the defendant because it's my understanding this discovery by Mr. Rossbach of Mr. Friedlander's similar experiences with Officer Haynes was derived from jailhouse discussions when they were both in jail in Flathead County together. And so the fact that he was in jail or is in jail is going to come out anyway, I would assume, in the course of cross-examination as to how the story—and the State's position is it was concocted.

¶20 A district court has discretion over trial administration decisions, and we will not disturb those decisions absent an abuse of discretion. *State v. Sheehan*, 2005 MT 305, ¶ 18, 329 Mont. 417, 124 P.3d 1119 (citations omitted). A district court's control over its courtroom is especially important when it comes to issues of safety. It is for this reason we have held that a district court "has wide discretion to decide whether a defendant who has a propensity for violence poses a security risk and warrants increased security measures." *State v. Herrick*, 2004 MT 323, ¶¶ 14-15, 324 Mont. 76, 101 P.3d 755 (citation and quotation omitted). The same is necessarily true for witnesses. Although "[t]he due process clauses of the United States Constitution and Montana Constitution entitle criminal defendants to appear before a jury free from physical restraints," *State v. Hartsoe*, 2011 MT 188, ¶ 22, 361 Mont. 305, 258 P.3d 428, we have not recognized the same right for defense witnesses and decline to do so as a matter of law. The Dissent cites several cases in which courts have held that a defendant has a right to have witnesses appear free from restraints but acknowledges that this rule "is not absolute," and a district court has discretion to require restraints when "it is necessary to protect courtroom security." Dissent, ¶ 38. We recognized in *Hartsoe* that district courts have discretion to require

8

accused defendants to appear in jail clothing, handcuffs, or shackles when justified by a compelling state interest, like a risk of flight or other safety concerns. *Hartsoe*, ¶¶ 22-23. We decline to impose absolute requirements on a trial court when considering a request that a witness testify in civilian clothing or free from restraints. Like other matters of trial administration, we instead review the claimed error for abuse of discretion. On the other hand, we caution district courts against routinely requiring defense witnesses to appear in jail clothing, handcuffs, and shackles. We agree with the Dissent that the trial court should hold a hearing and state on the record its reasons for requiring such measures. Dissent, ¶ 38. Courts recognize that "the responsibility for requesting a hearing rests with the parties." *State v. Rodriguez*, 45 P.3d 541, 545 (Wash. 2002). And "a judge's refusal to order the removal of shackles, where there exists any reasonable basis for anticipating that a prisoner may attempt to escape, will not be overruled." *Loux v. United States*, 389 F.2d 911, 920 (9th Cir. 1968) (quoting *Commonwealth v. Chase*, 217 N.E.2d 195, 197 (Mass. 1966)).

¶21 Rossbach raised the issue of Friedlander dressing in civilian clothes to the District Court the morning of trial, a mere thirty minutes before the trial was scheduled to begin. The court understandably did not want to keep the jury pool waiting while it conducted a hearing to determine the full scope of the identified potential safety concerns. Despite these timing concerns, the court allowed Rossbach's counsel to present her argument that Friedlander should be permitted to dress in civilian clothing and allowed the State to respond. Taking both parties' arguments into account, the District Court considered the possible prejudicial effect of Friedlander's appearance in light of the fact

9

that the jury likely would learn that Friedlander had met Rossbach in jail. The court did not simply allow a jail administrator's policy to dictate its decision. "[H]owever informal," and despite defense counsel's failure to request a hearing before the first day of trial, the court heard from both parties on Rossbach's last-minute request. *See State v. Damon*, 669 A.2d 860, 863 (N.J. Super. Ct. App. Div. 1966) (holding that, because discretion in keeping *a defendant* restrained at trial is "sharply limited," "[t]he judge must hold a hearing, however informal, and state on the record out of the jury's presence his or her reasons for shackling the defendant, whether they are based on evidence from trial, information obtained from criminal records, or statements made by law enforcement officers").

¶22 The court considered the potential security risks—including Friedlander's history of violence and his threats to escape—against the possible prejudice to Rossbach before denying his request. Its decision was a discretionary one, grounded in the information it received moments before trial, and it did not act arbitrarily or exceed the bounds of reason.

¶23 In the final analysis, we conclude that Rossbach has not shown prejudice from Friedlander's appearance on the stand. Jail garb aside, Friedlander's testimony had not the strength Rossbach gives it. Friedlander, like Rossbach, had a relationship with Officer Haynes's wife. Rossbach sought to establish that Officer Haynes used excessive force on both men because of their prior relationships with his wife. Friedlander testified that he had interacted with Officer Haynes twice. In the first instance, Officer Haynes, during a traffic stop, "overstepp[ed] his bounds a little bit" and was "overly aggressive" while putting handcuffs on Friedlander. Friedlander stated, however, that he "asked

10

[Officer Haynes] to back off [and] he did." Regarding the second encounter, Friedlander testified that Officer Haynes "was professional. He was civil to me." Friedlander acknowledged that he was "[a] little nervous when [Officer Haynes] showed up . . . but [Officer Haynes] was professional in that context." Friedlander's testimony does not demonstrate that Officer Haynes had a pattern of using excessive force against his wife's former boyfriends—rather, it shows that Officer Haynes listened to Friedlander and responded when Friedlander asked. Friedlander was not present and did not witness the interaction between Rossbach and Officer Haynes, had not experienced the kind of treatment that Officer Haynes reportedly visited upon Rossbach, and had not seen the officer treat anyone else that way on other occasions. He did not offer testimony that was "pivotal" to the case. Dissent, ¶ 41. On the full trial record, we are unable to conclude that the trial court abused its discretion to the prejudice of Rossbach's substantial rights when it allowed Friedlander to testify in shackles, handcuffs, and a jail jumpsuit over Rossbach's objection. *See* § 46-20-701(2), MCA.

¶24    *3. Whether the District Court illegally sentenced Rossbach as a persistent felony offender under § 46-1-202(18)(b)(ii), MCA, based on his release from a sentence on revocation when his most recent felony conviction was in 2001.*

¶25    A district court's designation of a defendant as a PFO is a question of statutory interpretation that we review de novo. *Gallagher*, ¶ 16.

¶26    The State may seek a PFO designation for "an offender who has previously been convicted of two separate felonies and who is presently being sentenced for a third felony

11

committed on a different occasion than either of the first two felonies."

Section 46-1-202(18), MCA (2017).[1] An offender has qualifying previous convictions if:

> (a) the two previous felonies were for offenses that were committed in this state or any other jurisdiction for which a sentence of imprisonment in excess of 1 year could have been imposed;
> (b) less than 5 years have elapsed between the commission of the present offense and either:
> > (i) the most recent of the two felony convictions; or
> > (ii) the offender's release on parole or otherwise from prison or other commitment imposed as a result of a previous felony conviction; and
> (c) the offender has not been pardoned on the ground of innocence and the conviction has not been set aside at a postconviction hearing.

Section 46-1-202(18), MCA. If an offender qualifies as a PFO, a district court must sentence the offender under § 46-18-502, MCA.

¶27 The District Court sentenced Rossbach as a PFO under § 46-18-502, MCA, because of his 1996 aggravated assault conviction and his 2001 robbery conviction. For the robbery, Rossbach was sentenced to fifteen years in prison, with eleven years suspended. His suspended sentence was revoked three times, in June 2006, May 2011, and May 2015, for drug use, failure to attend Alcoholics Anonymous meetings, absconding from supervision, failure to obtain employment, and tribal court misdemeanor offenses. Rossbach argues that he does not meet the criteria of § 46-1-202(18), MCA, because he was in prison not for his previous felony conviction but because his suspended sentence was revoked. He contends that (1) the revocation of a suspended sentence does not constitute a "conviction" or an "other commitment," (2) a release from a revocation cannot

---

[1] We apply "the law in effect at the time of the commission of the crime" to "the possible sentence." *State v. Thomas*, 2019 MT 155, ¶ 10, 396 Mont. 284, 445 P.3d 777 (quoting *State v. Finley*, 276 Mont. 126, 147, 915 P.2d 208, 221 (1996)).

12

trigger the five-year statutory period for a PFO, and (3) his release from commitment was not directly tied to his previous felony conviction, but instead to his violating conditions of probation.

¶28 Rossbach first argues that *State v. Smith*, 232 Mont. 156, 755 P.2d 569 (1988), supports his assertion that the revocation of a suspended sentence is not a conviction or an "other commitment." In *Smith*, we held that a three-year suspended sentence imposed under § 46-18-201(2), MCA, with numerous probationary conditions did not constitute a "commitment" under § 46-18-202(18), MCA. 232 Mont. at 161, 775 P.2d at 572. We explained that a commitment is "the act of taking or sending to the prison, mental health facility, or the like[,]" and that "[a] person is committed when he is actually sentenced to confinement by the court as contrasted with a suspended sentence or probation." *Smith*, 232 Mont. at 161, 775 P.2d at 572 (citing *Black's Law Dictionary*, 248 (5th ed. 1979)). A commitment "begins when the defendant is handed over to law enforcement personnel for confinement." *Smith*, 232 Mont. at 161-62, 775 P.2d at 572. We further explained what constitutes an "other commitment" in *State v. Montoya*, 1999 MT 180, 295 Mont. 288, 983 P.2d 937. We held that Montoya's release following the revocation of his suspended sentence and his recommitment to the Montana State Prison (MSP) triggered the commencement of the five-year period in § 46-18-502, MCA, despite the felony occurring more than five years earlier. *Montoya*, ¶ 27.

¶29 Rossbach's situation is analogous to Montoya's, not to Smith's. Unlike Smith, who was sentenced under § 46-18-201(2), MCA, and served his suspended sentence without incident, both Rossbach and Montoya were sentenced under § 46-18-201(3), MCA, and

13

were committed to the Department of Corrections (DOC) or MSP custody after violating the terms of their suspended sentences. As we held in *Montoya*, commitment to DOC or MSP custody following the revocation of a suspended sentence constitutes an "other commitment" under § 46-18-202(b)(ii), MCA. *Montoya*, ¶ 27.

¶30 Rossbach argues next that his imprisonment was a result of the revocation of his suspended sentence, not of the felony itself, so his release from custody in 2019 cannot trigger the five-year statutory period under § 46-1-202(18)(b), MCA. We disagree. Following Rossbach's third probation violation in 2015, the District Court revoked his suspended sentence under § 46-18-203(7), MCA, and committed him to the DOC under § 46-18-201(3)(a)(iv), MCA, for the remaining term of his sentence. Under § 46-18-203(7), MCA, a district court, upon a finding "that the offender has violated the terms and conditions of the suspended . . . sentence," may "revoke the suspension of sentence and require the offender to serve . . . the sentence imposed[.]" The District Court revoked Rossbach's suspended sentence and required him to serve the remainder of his 2001 sentence for felony robbery in DOC custody. Rossbach was released from custody in March 2019. His release was therefore "a result of a previous felony conviction." Section 46-1-202(18), MCA. Because the DOC released Rossbach from custody on March 5, 2019, and he assaulted Officer Haynes two months later, Rossbach is well within the five-year requirement of § 46-1-202(18), MCA.

## CONCLUSION

¶31 Rossbach has failed to show that the District Court committed reversible error when it denied his motion for a continuance and required Friedlander to testify in his jail

14

jumpsuit, shackles, and handcuffs. The District Court correctly sentenced Rossbach as a PFO. The District Court's December 19, 2019 order, February 5, 2020 order, and its April 1, 2020 sentencing order are affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

Justice Laurie McKinnon, dissenting.

¶32 I would join the majority of jurisdictions that have held, absent some compelling reason for physical restraint, inmate witnesses may appear in court without being shackled. Further, no compelling reason exists to require a witness appear before a jury in prison garb. In my view, it was an abuse of discretion for the District Court to delegate to detention personnel the decision of whether Friedlander would wear civilian clothes and be shackled and handcuffed. I dissent.

¶33 Both the state and federal constitutions guarantee defendants the right to a fair trial before an impartial jury. U.S. Const. amend V, VI, and XIV; Mont. Const. art. II, section 24. The fair trial right entitles a defendant to "have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S. Ct. 1930, 1934 (1978). The fair trial right is

15

tethered to the basic principle of American jurisprudence that a person accused of a crime is presumed innocent until his guilt has been established beyond a reasonable doubt. *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 1692-93 (1976). The right precludes, absent compelling reasons, placing a defendant in physical restraints and requiring him to appear in distinctive prison garb because the jury is likely to consider such a defendant as "being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers." *Kennedy v. Cardwell*, 487 F.2d 101, 106 (6th Cir. 1973) (quoting *State v. Kring*, 64 Mo. 591, 593 (1877)). Thus, as a general rule, a defendant in a criminal case has the right to appear before the jury free from shackles or other physical restraints, and free of prison garb. *Illinois v. Allen*, 397 U.S. 337, 344, 90 S. Ct. 1057, 1061 (1970).

¶34    Pertinently, for the presumption of innocence to be effective and the right to a fair trial protected, courts must guard against inherently prejudicial practices. "In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle*, 425 U.S. at 503, 96 S. Ct. at 1693. A trial is inherently prejudicial when "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S. Ct. 1340, 1346-47 (1986). An "inherently prejudicial" practice may be allowed "only where justified by an essential state interest specific to each trial." *Holbrook*, 475 U.S. at 568-69, 106 S. Ct. at 1346.

¶35    Thus, inherent in a defendant's right to fair trial and his right to appear before the jury without physical restraints and jail clothing is his right to have his witnesses appear

16

that way as well. While clearly the right to a fair trial and presumption of innocence is a right of the defendant, the appearance of a defense witness in restraints and prison garb undermines the credibility of the testimony that witness offers on the defendant's behalf. Accordingly, the general rule that a defendant may not appear as a prisoner before the jury has been extended to inmate witnesses by every court to consider the issue. See *United States v. Brooks*, 125 F.3d 484, 499 (7th Cir. 1997); *Wilson v. McCarthy*, 770 F.2d 1482, 1484-85 (9th Cir. 1985); *Kennedy*, 487 F.2d at 105, n.5; *United States v. Roustio*, 455 F.2d 366, 371 (7th Cir. 1972); *Williams v. Alaska*, 629 P.2d 54, 57-58 (Alaska 1981); *Kansas v. Ward*, 256 P.3d 801, 824 (Kan. 2011)(concluding "a trial court almost always abuses its discretion" when it allows a witness to testify in jail clothing without an explanation of its necessity and without giving a cautionary instruction); *Hightower v. Nevada*, 154 P.3d 639, 642 (Nev. 2007); *New Jersey v. Artwell*, 832 A.2d 295, 298 (N.J. 2002); *Washington v. Rodriguez*, 45 P. 3d 541, 545 (Wash. 2002).

¶36 The American Bar Association has recommended rules in line with these holdings: Courts "should not permit a . . . witness to appear at trial in the distinctive attire of a prisoner, unless waived by the defendant . . . nor should . . . witnesses be subjected to physical restraint . . . unless the court has found such restraint necessary . . . ." ABA Standards Relating to Trial by Jury § 15-3.2(b)-(c), at 185 (3d ed., ABA 1996) (hereinafter "ABA Standards").[1]  Commentary to the ABA Standards emphasize this recommendation

---

[1] While we have not adopted ABA Standards outright, we have frequently cited to them approvingly. *See, e.g., State v. Criswell*, 2013 MT 177, ¶ 55, 370 Mont. 511, 305 P.3d 760; *State v. Norquay*, 2011 MT 34, ¶ 39, 359 Mont. 257, 248 P.3d 817; *State v. Couture*, 2010 MT 201, ¶ 76, n. 4, 357 Mont. 398, 240 P.3d 987.

reflects "a moral reluctance" to subject defendants and witnesses to restraint if other less restrictive options are available. ABA Standards at 188. The Commentary to the ABA Standards further mandates "[t]he decision to use restraints . . . should be made by the *judge*, and not by law enforcement officers." ABA Standards at 190 (emphasis added).

¶37 The issue here is whether the appearance of Friedlander before a jury while shackled, handcuffed, and in distinctive prison garb furthered a compelling state interest and was a constitutionally tolerable justification to support the inherent prejudice to Rossbach's fair trial right. The inherent prejudice lies "not merely in the fact that the jury may suspect that the witness committed a crime," but in "the inherent psychological impact" that restraints will have on the jury's assessment of credibility. *Williams*, 629 P.2d at 57-58. "Requiring a witness to testify in shackles also encourages the jury to perceive the defendant as one who must turn to the testimony of a putatively 'guilty' individual to help salvage his case." *Artwell*, 832 A.2d at 301. The appearance of defense witnesses in restraints and prison garb may "hurt the defendant in so far as the witness is conceived to be associated with him . . . ." *Massachusetts v. Brown*, 305 N.E.2d 830, 834 (Mass. 1973). Although the shackling of defense witnesses may prove less prejudicial to the accused because it does not *directly* affect the presumption of innocence, it nonetheless harms his defense by detracting from his credibility. *United States v. Garcia*, 625 F.2d 162, 167-68 (7th Cir. 1980). There is no dispute that prison garb, shackles and handcuffs have effects on a jury that are difficult to quantify. The associated guilt and prisoner status of an inmate witness has the potential to prejudice the presumption of innocence and the right to a fair trial to which the defendant is entitled.

18

¶38 I recognize the general rule precluding inmate witnesses from appearing before a jury in prison garb and being physically restrained is not absolute. While the appearance of a defense witness in restraints and prison garb presents a risk of unfair prejudice, the trial court may subject a witness to restraints when it has reason to believe it is necessary to protect courtroom security. Whether the State has demonstrated a need to compel a witness to be shackled and in prison garb is committed to the discretion of the trial judge. It is, however, the trial judge—and not detention personnel—who must make the decision. The trial judge remains best equipped to protect the defendant from unfair prejudice and decide the extent of security measures necessary to prevent disruption of the trial, harm to those in the courtroom, escape of the accused, and to prevent other crimes. Because the appearance of a defense witness in restraints presents a risk of unfair prejudice to a defendant, a trial court may subject a witness to physical restraint only when it has reason to believe it is necessary to maintain the security of the courtroom. *Loux v. United States*, 389 F.2d 911, 919 (9th Cir. 1968). In that instance, the trial court should "hold a hearing, however informal, and state on the record out of the jury's presence [its] reasons for shackling the [witness], whether they are based on evidence from trial, information obtained from criminal records, or statements made by law enforcement officers." *New Jersey v. Damon*, 669 A.2d 860, 863 (N.J. Super. Ct. App. Div. 1996). In my opinion, until that record is made, inmate witnesses cannot be physically restrained or required to wear prison garb. Given this framework, it is axiomatic that a "policy" of letting detention personnel decide whether an inmate witness wears prison garb and is shackled ignores the requirement that trial courts create an appropriate record containing the reasons for

19

enhanced courtroom security which justify encroachment of a defendant's right to a fair trial.

¶39 Unlike the use of restraints, requiring a witness to wear prison garb in front of a jury furthers no compelling state interest at all. Instead, the practice only prejudices a defendant by undermining his witness's credibility and suggesting his guilt by association. While there may be some administrative inconvenience in allowing for a witness to change clothes, the fact that it may be more convenient for detention personnel to have defense witnesses remain dressed in prison clothes is not an essential state interest that justifies the practice. We have recognized this as it relates to the defendant's right to wear their own clothes in court. *State v. Rodriguez*, 192 Mont. 411, 420, 628 P.2d 280, 285 (1980) ("The inconveniences to the custodial officials cannot override the defendant's right to fair treatment when appearing in court.") I see no reason not to extend similar reasoning here. In my opinion, there was no justification for Friedlander to appear before the jury in prison garb and the District Court could have easily accommodated defense counsel's request to have him change into the clothes she had prepared and brought to the courtroom.

¶40 Here, in the week prior to trial, Rossbach's attorney talked to detention staff about Friedlander wearing civilian clothing when testifying. Detention staff told defense counsel Friedlander would be allowed to change into civilian clothes. The evening before trial, defense counsel took clothes to the jail for Friedlander to try on and pick out the clothes that fit. Defense counsel ironed them that evening and brought them to court the next day for Friedlander to change into and wear when testifying. However, defense counsel learned the morning of trial that detention staff had changed position and informed the trial judge

20

in the hallway, off the record and out of the presence of counsel and Rossbach, that Friedlander should remain shackled and in his prison garb when in the courtroom. The District Court allowed defense counsel to make a record of her objection but determined to leave the decision to court security. The State offered that Friedlander presented a flight risk, not a security risk. No evidentiary hearing was held, not even a brief hearing; the adequacy of alternative measures to minimize Friedlander's flight risk were never considered; and a record was never made concerning Friedlander's history, the nature and physical security of the courtroom, or Friedlander's age and physical attributes. Notably, the District Court did not distinguish between Friedlander appearing in shackles and handcuffs from his appearance in prison garb. Based on this record, there is no legitimate state interest requiring Friedlander to remain dressed in prison garb. Rossbach's counsel brought civilian clothes to the courtroom and notified the court as soon as practicable once she learned detention staff would not allow Friedlander to change clothes.

¶41 Lastly, I cannot accept that the prejudice to Rossbach's fair trial right was harmless error. Friedlander was a material witness to Rossbach's defense and had experienced Officer Haynes's use of force when carrying out arrests and could testify about his credibility. These were pivotal considerations for the jury and went to the heart of Rossbach's defense. Friedlander's appearance in prison garb, handcuffs, and shackles, undermined his credibility and the testimony he offered on Rossbach's behalf.

¶42 To fully protect a defendant against being convicted by impermissible factors rather than solely by the evidence, the rule against physical restraint, absent a showing of necessity, must apply to all inmate witnesses. There can be no compelling reason or

21

legitimate state interest which requires a witness to appear before a jury in prison garb. In my opinion, the shackling of a witness, in the absence of both a record-based compelling state interest and a decision by the trial judge charged with the responsibility of protecting a defendant's right to a fair trial, is an affront to the dignity of the court. "It offends not only judicial dignity and decorum, but also that respect for the individual which is the lifeblood of the law." *Allen*, 397 U.S. at 350-51, 90 S. Ct. at 1064 (Brennan, J., concurring).

¶43    I dissent. I would reverse and remand for a new trial on this issue alone.

/S/ LAURIE McKINNON

Justice Ingrid Gustafson and Justice Dirk Sandefur join in the Dissent of Justice McKinnon.

/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR